419 F.2d 195
 Marietta NORTON, Oscar Heffner, Richard Crawford, Joseph Garber, David Coker, George Ball, Robert McCall and Mike Haga, Plaintiffs-Appellants,
v.
The DISCIPLINE COMMITTEE OF EAST TENNESSEE STATE UNIVERSITY, Mack Davis, Ella Ross, Dorman Stout, Willene Paxton, Joan Dressel, John Mercer, Phil Thomas, East Tennessee State University, Delos P. Culp and The State Board of Education of and for The State of Tennessee, Defendants-Appellees.
 No. 19107.
 United States Court of Appeals Sixth Circuit.
 November 28, 1969.
 
 Karen D. Ennis, Nashville, Tenn., for appellants; Charles Morgan, Jr., Reber F. Boult, Jr., Atlanta, Ga., on brief; Melvin L. Wulf, Eleanor Holmes Norton, New York City, of counsel.
 Thomas E. Fox, Deputy Atty. Gen., Nashville, Tenn., for appellee.
 Before WEICK, O'SULLIVAN and CELEBREZZE, Circuit Judges.
 WEICK, Circuit Judge.
 
 
 1
 Appellants, students of East Tennessee State University, were suspended by the University's Discipline Committee after a hearing on charges of distributing on the campus "material of a false, seditious and inflammatory nature." This material was calculated to cause a disturbance and disruption of school activities and to bring about ridicule of and contempt for the school authorities. The students perfected an administrative appeal to the President of the University, who upheld the decision of the Discipline Committee.
 
 
 2
 The students then instituted the present action in the District Court under the civil rights statutes for a mandatory injunction to compel their reinstatement, claiming that their constitutional rights had been denied them. The District Judge, who had previous experience in cases of this type,[1] granted them an evidentiary hearing. Each of the appellants, the Chairman of the Discipline Committee, and the President of the University testified. A stipulation was admitted in evidence containing the alleged inflammatory literature and an admission that each of the appellants distributed one or both pieces of it. Transcripts of the hearings conducted by the Discipline Committee were received in evidence. The District Judge at the conclusion of the hearing rendered an oral opinion and adopted findings of fact and conclusions of law, in which he denied the injunction. This appeal followed.
 
 
 3
 Two pieces of the alleged inflammatory literature were distributed, one on May 28, 1968, and the second on May 30, 1968, the latter being only one day before the beginning of final examinations. The Discipline Committee took immediate action and sent three-day notices of a hearing to be held on the charges to all of the students who had distributed the literature except two students who received only one day's notices. Copies of the offensive literature are appended hereto.
 
 
 4
 Dean Davis, Chairman of the Discipline Committee, testified:
 
 
 5
 "I felt that the whole idea was designed to disrupt the functioning of the University and to adversely prejudice the students on the campus. I felt that it * * * that the contents of both handouts could conceivably cause an eruption on the campus which would disturb the functioning of the University."
 
 
 6
 Dr. Culp, the President of the University, testified:
 
 
 7
 "Q. Dr. Culp, did you think that these handouts tended to disrupt the school program and interfere with the education of people who were concerned about acquiring an education?
 
 
 8
 "A Yes, I had very definite fears that we might have serious consequences on the campus."
 
 
 9
 The District Judge was of the view that the inflammatory nature and disruptive characteristics of the literature appeared on its face. He made the following finding of fact:
 
 
 10
 "XIV
 
 
 11
 "That the Discipline Committee could properly have found that these documents were abrasive, abrupt and rude in character and that they were calculated to arouse resentment both on the part of the administration and on the part of the students of East Tennessee State University.
 
 
 12
 "XV
 
 
 13
 "That at least one document is susceptible of the interpretation that the writer of the article is encouraging demonstrations similar to those which had occurred on other campuses throughout the country; and the article can be reasonably and logically construed to mean that the writer of the article was calling upon the students of East Tennessee State University to engage in the same kind of conduct and activity which had occurred at Columbia University and elsewhere." (202a-203a)
 
 
 14
 This finding would appear to be supported by the following excerpt from the first sheet:
 
 
 15
 "And how has the ETSU student body reacted: Have they precipitated a revolution like French students? No. Have they brought about an entirely new and liberal administration like Polish students? — No. Have they been the forerunners of a new democratic spirit like Czech students? — No. Have they seized buildings and raised havoc until they got what they were entitled to like other American students? — No. What then have the ETSU students done? They have sat upon their rears and let the administration crap upon their heads, thats what.
 
 
 16
 That's right folks, in case you'd not noticed, ETSU students are in the vast majority apathetic — they open their mouths only to yawn, life [sic] their arms only to stretch, and like unto L'il Abner's Smoes, exist only to serve those who would take advantage of them.
 
 
 17
 Well, Smoes, what have you to look forward to next year? Maybe the administration will buy some Dean's turnip patch for ninety grand. Maybe all the girls will be required to wear chastity belts (the keys to be kept on reserve at the library — check 'em out for an hour at a time). Maybe social hours will be made applicable to males as well as females. Maybe — Maybe — Maybe —
 
 
 18
 Maybe students will get some sense and learn that this should cease and that the only way to see that it does is to stand up and fight. Maybe students will learn that the Supreme Court has declared that young people do not sacrifice their citizenship and all rights and privileges therewith by enrolling in a university. Maybe students will learn that no matter what the despots who run this school say, students have the constitutional right to protest, demonstrate, and demand their rights; that women students may not constitutionally be campussed; that students may damned well wear what they want and say what they please. And maybe, just maybe, they will discover that there are student leaders, organizers to rally around so as to assault the bastions of administrative tyranny. Maybe students will learn that at least. And remember that when the time comes to fight for what you are justly entitled to, that if you refuse to come along then you have no justification whatsoever for ever complaining again. When you are called to protest and you sit back on your butt, then, baby, that means that whatever the administration does is OK with you. When we move against them, remember, like the man says, `Put up or shut up.'" (18a)
 
 
 19
 The language, referring to their fellow students, "Have they seized buildings and raised havoc until they got what they were entitled to like other American students", was obviously intended to call their attention to campus disturbances around the country, and would include such universities as Columbia, Berkeley, Harvard, Cornell, Ohio State and Kent State. The students were urged to "stand up and fight" and to "assault the bastions of administrative tyranny." This was an open exhortation to the students to engage in disorderly and destructive activities.
 
 
 20
 The University administration was referred to with an obscenity and called "despots". This vicious attack on the administration was calculated to subject it to ridicule and contempt, and to damage the reputation of the University.
 
 
 21
 The reference to "chastity belts" for girls is a crude, vulgar remark offensive to women students and beyond the dignity of most college students to make.
 
 
 22
 Reliance was made on the Supreme Court for declaration of the constitutional rights of the students to "damned well wear what they want and say what they please." In our opinion such reliance is misplaced. The students have no constitutional right to misbehave on the college campus.
 
 
 23
 In the second piece, which impliedly approved the first piece, the school administration was referred to as a "problem child"; and stated that it is a crime for the student to shelter by their silence that "problem child", and that the students should now reprimand "our misguided child" and educate him. "We must now educate the educators" and "teach them the lesson of reality * * * although they may be shocked by it."
 
 
 24
 Ordinarily students go to college to acquire an education, but these students apparently want to educate the teachers.
 
 
 25
 It would indeed be difficult to maintain discipline on the campus of an institution of higher learning if conduct of this type were tolerated. We would doubt that parents would send their college-age children to such an institution if they knew that the philosophy as contained in the literature was taught or sanctioned there. We cannot imagine that a student could have confidence in the teachers in a university such as the literature portrays.
 
 
 26
 Appellants contend that distribution of the two handouts was privileged under the First Amendment to the Constitution as an expression of free speech unaccompanied by acts of violence. They rely principally on Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L. Ed.2d 731 (1969), and cases cited therein. Tinker involved a few high school children who did nothing except wear black arm bands for a few days to publicize their objections to hostilities in Vietnam. These children did not urge a riot, nor were they disrespectful to their teachers.
 
 
 27
 Mr. Justice Fortas, who wrote the opinion in Tinker, was careful to mention:
 
 
 28
 "As we have discussed, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." Id. at 514, 89 S.Ct. at 740.
 
 
 29
 In the present case, Dean Davis and President Culp did forecast disturbances and they acted quickly to prevent threatened disorders by making the charges against the inciters and holding the hearings.
 
 
 30
 Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966), cited in Tinker, enjoined high school authorities from enforcing a regulation forbidding students from wearing "freedom buttons" with the words "One Man One Vote" and "SNCC" thereon. There was no proof that regular activities of the school were hampered.
 
 
 31
 On the same day of the decision in Burnside, however, the Fifth Circuit reached an opposite conclusion in Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966), where the wearing of such buttons "created a state of confusion, disrupted class instruction, and resulted in a general breakdown of orderly discipline."
 
 
 32
 After distribution of the first piece in the present case, twenty-five students went to the office of Dean Thomas and wanted to get rid of this group of agitators.
 
 
 33
 It is not required that the college authorities delay action against the inciters until after the riot has started and buildings have been taken over and damaged. The college authorities had the right to nip such action in the bud and prevent it in its inception. This is authorized even in criminal cases.
 
 
 34
 As well stated by Chief Justice Vinson in Dennis v. United States, 341 U.S. 494, at 509, 71 S.Ct. 857, at 867, 95 L.Ed. 1137 (1951):
 
 
 35
 "Obviously, the words cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited. If Government is aware that a group aiming at its overthrow is attempting to indoctrinate its members and to commit them to a course whereby they will strike when the leaders feel the circumstances permit, action by the Government is required."
 
 
 36
 In Schenck v. United States, 249 U.S. 47, at 52, 39 S.Ct. 247, at 249, 63 L.Ed. 470 (1919), Mr. Justice Holmes said:
 
 
 37
 "We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. Aikens v. Wisconsin, 195 U.S. 194, 205, 206, 25 S.Ct. 3, 49 L.Ed. 154. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 439, 31 S.Ct. 492, 55 L. Ed. 797, 34 L.R.A.(N.S.) 874. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree."
 
 
 38
 Nor does this case involve lack of due process which was denied in Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.1961), and Knight v. State Board of Education, 200 F. Supp. 174 (D.C.M.D.Tenn.1961). Three days' notice of hearing was given to all except two students, and one of them appeared with his lawyer. On the day of the hearing some of the students asked for a postponement to get counsel, but the request for a continuance was denied because the Committee was of the view that they had had a reasonable opportunity to obtain counsel if they really wanted them. The District Judge held that the question whether a continuance should be granted was discretionary with the Committee, and he found no abuse of discretion. He was motivated largely by the fact that the inflammatory nature and disruptive characteristics of the literature appeared on its face and it was unnecessary to obtain evidence to prove that fact. We agree.
 
 
 39
 At the hearing before the Committee each student was given full opportunity to state his views. The President of the University was impressed by the fact that none of the students expressed any sorrow or regret for what he had done. None of the students gave any reason for not taking up grievances with the Committee established to hear them, namely, the Student-Faculty Liaison Council.
 
 
 40
 Furthermore, each student was given an opportunity to obtain counsel in his administrative appeal to the President, but no one availed himself or herself of that right. They were also given a plenary hearing in the District Court with counsel. Their contention of a denial of due process was thereby rendered moot. Barker v. Hardway, 399 F.2d 638 (4th Cir.1968).
 
 
 41
 Finally, it should be emphasized that appellants were not expelled from the University, but were merely suspended. The difference between expulsion and suspension was explained by Dr. Davis as follows:
 
 
 42
 "I continue to hear reference to the matter of expel or expulsion. We at no time even mentioned the word expel or expulsion.
 
 
 43
 "The plan of suspension is a restraint from enrollment which gives those of us who are concerned with the administration affairs time to reflect and to study what has happened. It also gives the student time to reflect and to study, and to appear before the committee then so that the committee and the student can, if possible, come to an agreement about future attendance.
 
 
 44
 "There is a difference in the meaning of suspension and expulsion." (159a)
 
 
 45
 The District Judge at the close of the hearing suggested that the University give hearings on applications for reinstatements. The record does not reveal that any such applications were made. The students are apparently insistent that they had the right to do what they did and they are going to stand by it.
 
 
 46
 In our judgment there is no basis for federal interference with the disciplinary procedures of the State University in this case.
 
 
 47
 We agree with the District Court that the charges that the literature was false and inflammatory, was sufficiently definite.
 
 
 48
 It was not necessary to have a specific regulation providing for disciplinary action for the circulation of false and inflammatory literature. The University had inherent authority to maintain order and to discipline students. We do not believe that there is a good analogy between student discipline and criminal procedure.
 
 
 49
 Affirmed.
 
 EXHIBIT A
 STUDENTS ARE PEOPLE TOO
 
 50
 [First Piece]
 
 
 51
 Its been a long quarter, hasn't it? And an interesting one too. Too interesting in fact. This has been a quarter wherein the administration spent $94,000 to buy a lousy half-acre of land (rumored to belong to a near relative of a prominent Dean); a quarter wherein the administration has refused an opportunity to advance the school's athletic status (and God knows, it needs it) by rejecting membership in the Southern Conference; a quarter wherein the administration has forbidden girls to wear the latest fashions (the threat of a riot over-turned that ruling); a quarter wherein the administration fired some poor student from his job at the library because he grew a beard; a quarter wherein mandatory TOTC [sic] has continued unchallenged (the school gets paid so much money perhead by the Army, so, son, like it or not there is a price on your head); a quarter wherein the bookstore monopoly has persisted in its blatant piracy (and blew a fortune putting out a propoganda sheet), a quarter wherein the cafeteria fare has progressively worsened; a quarter wherein the administration seriously threatened censorship of the school newspaper (all those filthy pictures); a quarter wherein women's social rules were maintained at a level of liberality that was old when Queen Victoria was young; a quarter wherein the campus law (rent-a-cop) was permitted to continue carrying guns (caution: your local copy is armed and may be dangerous); a quarter where the administration bureacracy achieved new heights of rudeness, inefficiency, and intolerance. Yes — an interesting quarter.
 
 
 52
 And how has the ETSU student body reacted: Have they precipitated a revolution like French students? No. Have they brought about an entirely new and liberal administration like Polish students? — No. Have they been the fore-runners of a new democratic spirit like Czech students? — No. Have they seized buildings and raised havoc until they got what they were entitled to like other American students? — No. What then have the ETSU students done? They have sat upon their rears and let the administration crap upon their heads, thats what.
 
 
 53
 That's right folks, in case you'd not noticed, ETSU students are in the vast majority apathetic — they open their mouths only to yawn, life [sic] their arms only to stretch, and like unto L'il Abner's Smoes, exist only to serve those who would take advantage of them.
 
 
 54
 Well, Smoes, what have you to look forward to next year? Maybe the administration will buy some Dean's turnip patch for ninety grand. Maybe all the girls will be required to wear chastity belts (the keys to be kept on reserve at the library — check 'em out for an hour at a time). Maybe social hours will be made applicable to males as well as females. Maybe — Maybe — Maybe —
 
 
 55
 Maybe students will get some sense and learn that this should cease and that the only way to see that it does is to stand up and fight. Maybe students will learn that the Supreme Court has declared that young people do not sacrifice their citizenship and all rights and privileges therewith by enrolling in a university. Maybe students will learn that no matter what the despots who run this school say, students have the constitutional right to protest, demonstrate, and demand their rights; that women students may not constitutionally be campussed; that students may damned well wear what they want and say what they please. And maybe, just maybe, they will discover that there are student leaders, organizers to rally around so as to assault the bastions of administrative tyranny. Maybe students will learn that at least. And remember that when the time comes to fight for what you are justly entitled to, that if you refuse to come along then you have no justification whatsoever for ever complaining again. When you are called to protest and you sit back on your butt, then, baby, that means that whatever the administration does is OK with you. When we move against them, remember, like the man says, "Put up or shut up."
 
 
 56
 PLEASE SEAL AND STAMP ANY CORRESPONDENCE TO BOX 9527 ETSU
 
 EXHIBIT A-I
 
 57
 "STUDENTS ARE PEOPLE TOO"
 
 
 58
 "Congress must not interfere with freedom of religion, speech or press, assembly, and petition. Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the people peaceably to assemble, and to petition the government for a redress of grievances." (first amendment, U.S. constitution)
 
 
 59
 These aged words are a reality to most American people. "Students are people too, American people." These are young words that should be a reality. We find the administration at E.T.S.U. denying the reality of one group of these words by certain rules, regulations and policies. For our purposes we will put these unjust rules, regulations and policies into two broad categories. The first are those that restrict our personal freedom as "American people". The second being those that deny us the right to openly descent [sic] disagree with the first.
 
 
 60
 Even as we write this we are in danger with the school administration. Is this just, denying American people rights that are clearly stated in the first amendment of the constitution? By restricting our personal freedom and denying us the right of open descent [sic] about this, the administration of E. T. S. U. is saying that we are not "American people", and to those principles shall this publication be devoted.
 
 
 61
 *****THE PRESIDENTS DOOR IS ALWAYS OPEN BUT HIS MIND IS CLOSED*****
 
 
 62
 "EXTRACTS FROM THE STUDENT BILL OF RIGHTS. AAUP
 
 EXHIBIT A-II
 
 63
 Academic institutions exist for the transmission of knowledge, pursuit of truth, the development of students and general well being of society.
 
 1. Freedom of Access to Higher Education
 
 64
 A. Protection of freedom of expression — student is free to express any opinion in the classroom
 
 
 65
 B. Protection against improper academic evaluation — the student should be graded according to academic achievement and never should his grade be influenced by prejudice
 
 
 66
 C. Protection against improper disclosure — no information regarding student views, beliefs, or political associations should be released by the institution without the consent of the student
 
 II. Student
 
 67
 A. Freedom of Association — student should be free to organize and join associations to promote common interests of members.
 
 
 68
 1. Membership, policies and actions of the organization should be determined by vote of members.
 
 
 69
 2. If an advisor is required the members should choose the advisor and the advisor should be free only to advise the organization.
 
 B. Freedom of Inquiry and Expression
 
 70
 1. Students should be free to discuss any question that interest them and to express opinions publicly and privately
 
 
 71
 2. The student organization should be free to invite and hear anyone they may choose.
 
 
 72
 C. Student Participation in Institutional Government — students should be free to express opinions in regard to institutional policy. The students should also have a clearly defined means of participating in formulative and application of institutional policy affecting academic and student affairs
 
 D. Student Publications
 
 73
 1. Student press should be free from censorship and editors should be free to develop their own editorial policies and news coverage.
 
 
 74
 2. No editor should be removed for any editorial [sic] comment Off-Campus Freedom of Students
 
 
 75
 A. Exercise of Rights of Citizenship — All students have rights both as citizens and as members of the academic community
 
 
 76
 B. Institutional Authority and Civil Penalties — anytime a student has any trouble with the civil authority the institution should aid the student. No civil action should influence the institutions relation with the student.
 
 
 77
 IV. Procedural Standards in Disciplinary Proceedings
 
 
 78
 A. Investigation of Student Conduct — no institution official has the right to search a student's place of residence without a search warrant. In the case of institution dorms the institution should have to submit an application stating what the institution is searching for and why.
 
 
 79
 B. Status of Student Pending Final action — In a case in which a final decision has not been made. The institution should allow the students to practice all the rights he normally has
 
 EXHIBIT A-IV
 
 80
 [Second piece]
 
 STUDENTS ARE PEOPLE TOO
 Students of ETSU:
 
 81
 Mr. Oscar Heffner was questioned by Deans Thomas, Ross, and Davis May 28 concerning his alleged participation in the publication "Students are People Too." The publication contained several complaints about administrative policy concerning students' rights and privileges. The administrative position appears to be that no student has the right to distribute free literature on campus. The University Disciplinary Committee, which seats no students, met May 28. Mr. Heffner was unable to attend the meeting. Today, May 29, Mr. Heffner met with the appropriate Deans concerning his status at the University. Mr. Heffner was charged with distributing the publication and with attempting to incite students to riot. He will meet the Committee tomorrow, May 30.
 
 
 82
 Students' rights are at stake here. Any student has the same Constitutional rights as any other citizen of the United States, and he should be allowed to exercise his rights.
 
 
 83
 It is a mistake to hide truth from a child. To deny him reality is to cheat him. For when the time comes that he must meet and deal with reality, it will destroy him. It is a crime to shelter a child and to leave him unprepared. It is precisely this crime that we as students in this university are guilty of.
 
 
 84
 You see, we have a problem child. We have sheltered our administration with our silence. Although we will claim the administration as no offspring of ours, we are in a similar situation. We have allowed this administration to build a false ego; we have allowed them to think that we approve of their childish games.
 
 
 85
 We must now reprimand our misguided child. It is time to tell the administration the truth. In those hollow halls the administrators have long sat believing themselves to be "Educators." In playing this game they believe that unerring judgment comes only after many years rather than after much thought. It is with this false wisdom that they pass judgment and regulations on us. And we have followed this "wisdom" rather than crush the pride they hold in being dictators.
 
 
 86
 We must now educate the "educators." We must teach them the lesson of reality and allow them to know the truth, although they may be shocked by it.
 
 The lesson is:
 
 87
 1. They are not the rulers and we the ruled. We are equals. We do not follow their arbitrary decisions. We work together to arrive at decisions.
 
 
 88
 2. Their "wisdon" [sic] is false and their outlook is narrow.
 
 
 89
 3. We will not longer allow this ignorance to persist. If this insult to our position continues, we will calmly and intelligently exercise our power.
 
 
 90
 This lesson can be taught very simply by telling the administration these three points and by refusing to play their game any longer. This may be a cruel, possibly even tramatic, jolt to them, but it will be best for them in the long run.
 
 
 91
 So let us set about our task and teach this misguided child the facts of life. If we do, there is a good chance the child will mature into a rational, intelligent ADULT; if we don't, the creature will surely grow into a hungry, howling monster.
 
 
 92
 (SGD) Robert L. McCall
 
 
 
 Notes:
 
 
 [1]
 Jones v. State Board of Education, 279 F.Supp. 190 (D.C.M.D.Tenn.1968), aff'd, 407 F.2d 834 (6th Cir. 1969); Knight v. State Board of Education, 200 F.Supp. 174 (D.C.M.D.Tenn.1961)
 
 
 CELEBREZZE, Circuit Judge (dissenting):
 
 93
 In upholding the indefinite suspension, and the denial of the injunction, the majority apparently relies upon three grounds:
 
 
 94
 First, that there was sufficient evidence that the distribution of leaflets by the students would probably lead to an eruption or riot on campus that the University was justified in disciplining these students with indefinite suspensions, Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).
 
 
 95
 Second, that there was sufficient evidence that the distribution of the leaflets by the students would create a substantial and material interference with the normal activities of East Tennessee State University that the University was justified in disciplining these students with indefinite suspension, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 511, 89 S. Ct. 733, 21 L.Ed.2d 731 (1968).
 
 
 96
 Third, that the University had inherent authority to discipline by suspending indefinitely those students who engage in peacefully handing out leaflets containing false and inflammatory statements.
 
 
 97
 I believe that the pamphleteering in the instant case was protected First Amendment activity. Therefore, I dissent on all three grounds.
 
 
 98
 * I do not agree with the majority that the record contains sufficient evidence of a probable eruption on campus to validate the University's denial of the students' constitutional rights to engage in the peaceful distribution of handbills.
 
 
 99
 Although pamphleteering involves the conduct of distributing leaflets, it is afforded the broad First Amendment freedoms of speech and of the press. See Marsh v. Alabama, 326 U.S. 501, 66 S. Ct. 276, 90 L.Ed. 265 (1946); Jamison v. Texas, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Such First Amendment rights, applied in light of the special characteristics of the campus environment, are available to students and teachers participating in conduct akin to "pure speech". Indeed, the United States Supreme Court has emphasized that "in the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views". Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969). See Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L. Ed.2d 1311 (1957); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L. Ed. 1628, 147 A.L.R. 674 (1943). Hence, full First Amendment protection — subject to the usual First Amendment qualifications — applies to both teachers and students and must be a "vigilant[ly] protect[ed] constitutional freedoms * * * nowhere more vital than in the community of American schools." Shelton v. Tucker, 364 U.S. 479, 487, 81 S. Ct. 247, 251, 5 L.Ed.2d 231 (1960). See Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Meyer v. Nebraska, 262 U.S. 390, 402, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446 (1923).
 
 
 100
 Limitations on the scope of the First Amendment Free Speech Clause have been characterized in two ways: First, qualifications as to time, place and manner; and second, qualifications for the protection of the rights of others and for the prevention of actual or probable material interference with legitimate state interests.
 
 
 101
 With regard to the first class of qualifications, this record nowhere suggests that the time, place, or manner of speech used by the students supplies any basis for the disciplinary suspensions they received, notwithstanding a very broad power of the State to regulate non-discriminatorily such incidents of speech. The students did not form a cordon across the street or impede pedestrians who did not accept a tendered leaflet. Schneider v. State, 308 U.S. 147, 60 S. Ct. 146, 84 L.Ed. 155 (1939) (dictum). Leaflets were not tendered on a door-to-door basis late at night or early in the morning. See Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1941). Nor was the distribution accompanied by loud and raucous noises such as those from sound trucks or amplifiers. Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608 (1949).
 
 
 102
 The cautions of the United States Supreme Court in Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L. Ed.2d 471 (1965):
 
 
 103
 "The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time."
 
 
 104
 were heeded by the students on the facts of this case. See Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. New Hampshire, 312 U. S. 569, 61 S.Ct. 762, 85 L.Ed. 1049, 133 A.L.R. 1396 (1941). The pamphlets were distributed when neither student activity nor classes were scheduled so that students would have a fuller opportunity to prepare for examinations. The places of distribution were various customary spots on the University campus at which students generally have circulated handbills and other information. The manner of distribution was equally unobjectionable. There are no indications of pamphlets being foisted upon unwilling students or of any disturbance whatsoever, even when some leaflets were slipped beneath dormitory doors. Thus, the record indicates that neither the time, nor the place nor the manner of the students' pamphleteering caused even the slightest hint of probable or actual disruption.
 
 
 105
 The second limitation on the First Amendment's broad grant of protective activity is that of protecting the legitimate interests of the state from actual or probable material interference. Clearly, if such interference reached the proportions of an actual or probable campus eruption or riot, the speech initiating such a state of affairs could be proscribed. As Mr. Justice Holmes observed in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919), First Amendment guarantees of speech are qualified by the context in which the conduct or speech occurs:
 
 
 106
 "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 439, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A. (N.S.) 474. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree."
 
 
 107
 There is inadequate evidence in the record before us to sustain the majority's finding that there was any constitutionally significant degree of likelihood of eruption or riot based on the Schenck standard.
 
 
 108
 It is true that the Disciplinary Committee of East Tennessee State University, as the District Court found, determined that the leaflets in question were "of a potentially disruptive character"; and that the President of the University similarly found that these leaflets "very probably would have a disruptive effect."[1] These findings are entitled to little independent weight on appeal. In similar cases involving First Amendment rights, the United States Supreme Court has repeatedly affirmed the responsibility of the judiciary to independently review the record by looking beyond conclusory labels to determine whether there is sufficient evidence to support administrative findings of "clear and present danger" to a substantive state interest. See Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 509, 514, 89 S.Ct. 733, 21 L. Ed.2d 731 (1968); Pickering v. Board of Education, 391 U.S. 563, 578-579, 88 S.Ct. 1731, 20 L.Ed.2d 811 (appendix to opinion of the Court) (1967); New York Times Co. v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Pennekamp v. Florida, 328 U.S. 331, 66 S. Ct. 1029, 90 L.Ed. 1295 (1946); Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935). An independent review of the record is necessary, where, as here, the original fact finding bodies functioned simultaneously as counselor, fact-finder and prosecutor. Moreover, in the instant case the committee members and the President took personal affront to some of the information contained in the pamphlets and considered themselves victims of the students' actions. See Pickering, 391 U.S. at 579, 88 S.Ct. 1731; In Re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L.R. 1243 (1927).
 
 
 109
 The record reveals no grounds from which any neutral body could reasonably determine that there existed at any time on the East Tennessee campus an actual or probable danger of eruption so as to breach the standard of Schenck and its progeny.[2]
 
 
 110
 The majority points to two areas in the record to support its contention that an eruption was probable: (1) Twenty-five students visited the Dean's office after the distribution of the first pamphlet and "wanted to get rid of this group of agitators;" and (2) the documents themselves incited to a state of affairs in which actual disruption was probable.
 
 
 111
 (1) The fact that 25 students visited Dean Thomas after the first distribution and churlishly warned him "to get rid of this group of agitators" is not significant evidence of a clear and present danger of a campus disruption. In such a situation the Dean could surely have informed the 25 students that the University would not sanction vigilante groups of students determining what ideas and which students they shall permit to speak and which they shall "get rid of." The Dean might well have suggested that the 25 students print up their own pamphlet or write a letter to the University's daily newspaper expressing their consternation at the views of the distributed literature. With so many less drastic alternatives open, the University should not have abridged the rights of students expressing unpopular and controversial ideas so long as fears of possible violence from the 25 dissenting students could have been so easily abated. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 508, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Whitney v. California, 274 U.S. 357, 373, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Justices Brandeis and Holmes, concurring). See also, Gregory v. Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969) (anticipated unruly conduct of bystanders is no justification for the arrest of peaceful civil rights demonstrators).
 
 
 112
 The United States Supreme Court has noted that speech, especially on subjects of interest to the body politic, may be legitimately fashioned to provoke and stimulate debate. In Tinker, 393 U.S. at 508, 89 S.Ct. at 737, the Court noted:
 
 
 113
 "The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom or on the campus, that deviates from the views of another person, may start an argument or cause a disturbance. But our Constitution says we must take this risk, Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); and our history says that it is this sort of hazardous freedom — this kind of openness — that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious society."
 
 
 114
 The United States Supreme Court has been hesitant to proscribe speech, if less drastic, readily available alternatives are present, as they were in the situation presented to Dean Thomas by the 25 students. As Justices Brandeis and Holmes observed in concurrence, while upholding a conviction for conspiracy to commit certain serious crimes:
 
 
 115
 "[N]o danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion. If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." Whitney v. California, 274 U.S. at 377, 47 S.Ct. at 649.
 
 
 116
 (2) The documents themselves are cited by the majority as constituting evidence that there was a clear and present danger of disruption. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). I believe that the language of the pamphlets is abrasive, abrupt, rude, possibly even false and inflammatory;[3] however, Schenck requires an evidentiary showing of imminent disruption before such language can be considered a clear and present danger. In Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L. Ed. 1031 (1942), the United States Supreme Court upheld a state statute which had been construed to limit public speaking where the speech directly tended to incite the listener to acts of violence. The Court stated:
 
 
 117
 "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or `fighting' words — those which by their very utterance inflict injury or tend to incite an immediate breach of peace." 315 U.S. at 571-572, 62 S.Ct. at 769.
 
 
 118
 While the documents distributed by the students were coarse in their political satire and hyperbole, there is no evidence that their nature was such as to "incite" or "cause a breach of peace by provoking the person addressed to acts of violence." Indeed, there was no evidence of actual disruption or threat of disruption aside from the aborted "heckling veto" of 25 students the day after the distribution of the first pamphlet. Furthermore, the pamphlets' abrasive language is confined to the preamble and concluding portions of a document otherwise advocating a set of students' rights sanctioned by the prestigious American Association of University Professors. See Developments in the Law, Academic Freedom, 81 Harv. Law Rev. 1045, 1105-12 (1968). In fact, uncontroverted testimony of the students at the District Court hearing established that the first pamphlet was written in angry response to an alleged incident of censorship of the student newspaper, that its purpose was to inform the students of actions of the University of which the writer and others were critical, to congeal student opinion in support of reform, to "bring [students] together, and then find interested students to run for campus offices * * * student body president * * * student senate." The body of the first pamphlet considered such matters of topical concern to students as rights of free press for student publications, student participation in institutional government, and procedural standards in disciplinary proceedings. Similarly, the second pamphlet was motivated by topical campus considerations. The University considered disciplining one of the students in connection with the first pamphlet; and so, the second pamphlet was distributed "to inform the students about what had happened, and to help formulate a public opinion." As one student disarmingly said in the District Court:
 
 
 119
 "This is quite a legitimate way of doing this, don't you think?"
 
 
 120
 The majority points to only one passage that could be reasonably and logically construed ("is susceptible of" to quote the District Court) to mean that the writer was encouraging or advocating the same kind of conduct that had occurred at Columbia University in the Spring of 1968. However, writing which may or may not be construed as "encouraging" unlawful activity does not constitute a "clear and present danger", particularly when the entire context of the document concerns matters of topical student concern. In Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the United States Supreme Court reversed the conviction of a Ku Klux Klan leader under Ohio's Criminal Syndicalism Statute, for "advocat[ing] * * * the duty, necessity, or propriety" of crime, sabotage, violence, or unlawful methods of terrorism "as a means of accomplishing industrial or political reform," to-wit:
 
 
 121
 "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 395 U.S. at 447, 89 S.Ct. at 1829.
 
 
 122
 Given the topical character of the subject matter and the context of the time, place, and manner in which the pamphlets were distributed, even the single statement susceptible of being read as "encouraging" unlawful activity should only be regarded as "advocacy", not "incitement". These pamphlets were not distributed in any angry crowd or in the wake of prior disturbances, but on a campus of presumably tempered and rational students. Imminent lawless action, such as occurred at Columbia, was not a clear and present danger on the facts and evidence of this case.
 
 II
 
 123
 In its second general ground the majority indicates that if the pamphleteering of the students created a material and substantial interference with the normal activities of the University, then it was not privileged. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). I agree.[4]
 
 
 124
 I cannot agree, however, that there is sufficient evidence in the record of the instant case to justify the conclusion that the pamphleteering created a probable or actual material and substantial interference with any of the normal activities of the University.
 
 
 125
 The majority, for reasons of its own, chose to analogize the facts of the instant case to those of Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir.1966), in which there was a total breakdown of good order and discipline in the school's operations. I believe the evidentiary record of the instant case is strikingly analogous to that of Tinker in which the United States Supreme Court found the students' conduct to be protected by the First Amendment.
 
 
 126
 The record in Tinker revealed no less disruption than does the record in the instant case. In Tinker, the record revealed that "disputes" caused by 13-year-old Beth Tinker's armband demonstration "practically wrecked" a lesson period in mathematics; that the armbands created dissension among the students, some of whom chose to tease the Tinker children, while others chose to protect them; and, finally, armband wearing in both the junior and senior high schools took the students' minds off their classwork and directed them to thoughts about the highly emotional subject of the Vietnam War. Tinker v. Des Moines Independent Community School District, 393 U.S. at 517-518, 89 S.Ct. 733. Upon this kind of evidence, the United States Supreme Court held that there was no showing of an actual disruption; and that the "evidence" of a "specific showing" of an imminent material interference with school activities was insufficient to justify the administrators in curbing the First Amendment rights of the Tinker children. As in the instant case, the Des Moines School authorities indicated to the Court their belief that such armband demonstrations tended to undermine the confidence students hold in their teacher's authority, and tended to involve the school in a subject matter discussion which may well be unpopular with the community-at-large.
 
 
 127
 On the other hand, in Blackwell, large numbers of students foisted buttons upon unwilling students; classroom sessions were halted by the parceling out of the SNCC buttons; several students deliberately absented themselves from their classes to dispense SNCC buttons to other students; and, in the words of Judge Gewin of the Fifth Circuit Court of Appeals, a "state of confusion" existed in which there resulted "a general breakdown of orderly discipline" throughout the school.
 
 
 128
 The record in the instant case, like that in Tinker, is devoid of the kind of "reprehensible conduct" present in Blackwell which Judge Gewin described as "inexorably tied to the wearing of the [SNCC] buttons." All concerned in the present case plainly admitted that there was not a single instance of actual violence, disruption or interference with the rights of others.
 
 
 129
 Of course, there are allegations in the instant case of a deterioration of respect by students for teachers and of likely disapproval of the pamphlets by the parents of college age students. Similar allegations were made in Tinker and dismissed as speculative fears, because of a lack of a specific evidentiary showing of actual or imminent harmful effect of the requisite magnitude to proscribe otherwise protected speech. As the Court said in Tinker:
 
 
 130
 "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden right would `materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained." 393 U.S. at 508-509, 89 S.Ct. at 738.
 
 
 131
 Although the record in this case does reveal that 25 students resented the pamphleteering of the Appellants, this reaction provided no basis for proscribing free speech.[5] In Tinker the Court apparently found insubstantial in its effect on school activities and discipline the "comments, warnings by other students the poking fun at them [the Tinker children] as well as the counter "warning by an older football player that other nonprotesting students had better let them alone." 393 U.S. at 517, 89 S.Ct. at 742.
 
 
 132
 Thus, an examination of the evidence in the record reveals that the instant case is almost indistinguishable on its facts from that of Tinker.[6] If, in Tinker, the United States Supreme Court found the evidentiary record inadequate to support a finding of material and substantial interference with the normal operations of a junior and senior high school; then there is certainly insufficient evidence in the present record to support a finding of "material and substantial interference" in the more adult educational environment of a university campus.
 
 III
 
 133
 In its third general ground, the majority indicates that university administrators have "inherent authority" to prescribe reasonable rules and regulations to prevent "false" and "inflammatory" expressions. Superficially, this regulatory power would seem to be an appropriate one to invest in expert university officials. See Goldberg v. Regents of University of California, 248 Cal.App.2d 867, 57 Cal.Rptr. 463 (1967).
 
 
 134
 In my opinion, however, the United States Supreme Court has found "inherent authorities" granted under such circumstances to be constitutionally deficient in two respects. First, one may not constitutionally conclude from the mere making of a false and inflammatory statement that it creates, in and of itself, the requisite substantive evil of material interference with the normal operations of a university which is necessary for the proscription of free speech. Second, an investment of discretionary authority to proscribe and to punish the making of false and inflammatory statements without a specific showing of a material interference with normal campus activities is unconstitutionally broad.
 
 
 135
 First, to say that false and inflammatory language — of itself — obviates the need to show probable or actual occurrence of material disruption in campus discipline or academic performance is to disregard the fundamental basis of the "clear and present danger" policy. As the United States Supreme Court noted in Dennis v. United States, 341 U.S. 494, 506-507, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), the underlying purpose of the doctrine of "clear and present danger" is to prevent certain speech from being proscribed upon a "showing that there was no danger that the substantive evil would be brought about."
 
 
 136
 In a spate of recent decisions, the United States Supreme Court has rejected the notion that an unlawful effect can be inferred from the face of a document which contains false and inflammatory language. Indeed, the Court has insisted upon a specific evidentiary showing of the prohibited effect before permitting proscription of speech. Thus, in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d 811 (1968), the United States Supreme Court overruled a dismissal of a teacher based on a presumption by the Board of Education that his "false" statements about the necessity of a school bond issue and the policies of his school administration were per se harmful to the operation of the schools. And in Brandenburg v. Ohio, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the Court held that one could not presume that "encouragement" of unlawful conduct would reach the stage of incitement; and hence, a state statute had to be narrowly drawn so as to proscribe only the latter and not the former. See also, Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (striking down teacher loyalty oath covering "seditious and treasonable" words or acts); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966) (striking down a teacher loyalty oath which conclusively presumes that those who join a subversive organization share in its unlawful aims).[7]
 
 Finally, in Tinker the Court held:
 
 137
 "In the absence of a specific showing * * * that * * * conduct would `materially and substantially interfere with the requirements of appropriate discipline in the operation of the school * * *. Burnside v. Byars, supra, 363 F.2d at 749, students are entitled to freedom of expression of their views." 393 U.S. at 511, 89 S.Ct. at 739.
 
 
 138
 There can be no question of university officials' power and responsibility to prescribe rules which are reasonably related to protection of the state's interest in the university. Where expression is the proscribed subject matter, however Tinker, read in the context of Pickering, Brandenburg, Keyishian, and Elfbrandt, requires, as one element of the offense, an evidentiary showing of actual or probable material interference with the normal operation of the university.[8]
 
 
 139
 Second, even assuming that this were not so, the breadth of discretion given to campus officials is constitutionally impermissible. University authorities are given virtually unqualified discretion to choose which false and inflammatory statements will be punished, and which will not be punished, without being required to support such a choice with a showing of material interference with the normal activities of the university. Such unqualified discretion may well be utilized to condone abrasively asserted — but not officially approved — sentiments; or what is worse, it may be used to suppress sentiments with which officials do not wish to contend.
 
 
 140
 The exercise of First Amendment rights can not depend upon whether an expression casts praise or obloquy upon matters or persons of public concern. I am of the opinion, from an evaluation of the whole record that had the students followed the same course of conduct and authored a document praising the present policies of the University administrators, and condemning the recommendations of the American Association of University Professors, no disciplinary action would have been taken.
 
 
 141
 This selective use of discretion to eliminate unflattering opinions of ones nominal superiors was a subject of concern to the United States Supreme Court in Pickering. In Pickering, the United States Supreme Court speculated that the real cause of Pickering's dismissal was not any detriment to the school system from false statements made by Pickering, but the Board's reaction to criticism of its own members.[9] The Court observed:
 
 
 142
 "However, the only way in which the Board could conclude, absent any evidence of the actual effect of the letter, that the statements contained therein were per se detrimental to the interest of the schools was to equate the Board members' own interests with that of the schools. * * * Such an accusation reflects rather a difference of opinion between Pickering and the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest." (Emphasis added) 391 U.S. at 571, 88 S.Ct. at 1736.
 
 
 143
 And in Tinker, the Court noted that in granting an official the discretion to proscribe free expression, care must be taken to assure that a "particular opinion" is not "singled out for prohibition."
 
 
 144
 "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to that expression of those sentiments that are officially approved. * * * As Judge Gewin, speaking for the Fifth Circuit, said, school officials cannot suppress `expressions of feelings with which they do not wish to contend.' Burnside v. Byars, supra, 363 F.2d at 749. Tinker, supra, 393 U.S. at 511, 89 S.Ct. at 739.
 
 
 145
 The policy underlying Pickering and Tinker is that limiting another's expression — be it inflammatory or false — on the basis of the ideas it expresses is repugnant to our democratic institutions. Hence, the United States Supreme Court observed:
 
 
 146
 "In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius their ideas touching the relation between individual and state were wholly different from those upon which our constitutions rest; and it hardly will be affirmed that any Legislature could impose such restrictions upon the people of a state without doing violence to both letter and spirit of the Constitution." Meyer v. Nebraska, 262 U.S. 390, 402, 43 S.Ct. 625, 627, 67 L.Ed. 1042, 29 A.L.R. 1446 (1923) (striking down in 1920 a state statute prohibiting the teaching of any language other than English when applied to the teaching of the German language to a child of ten years of age).
 
 
 147
 Absent a showing of material interference with school activities, it is constitutionally impermissible to give campus officials discretion so broad that there exists an almost irresistible invitation to censor those expressions personally offensive to them.
 
 
 148
 I would reverse the judgment of the District Court.
 
 
 
 Notes:
 
 
 [1]
 However, the actual testimony of Dean Davis (Chairman of the Discipline Committee) and Dr. Culp (President of the University) was less damning than the District Court's characterization of their testimony — to-wit, that the leaflets would "very probably" have a disruptive effect. Dean Davis stated at one point that the handouts "could conceivably" cause an eruption on campus; and he cited only his awareness that other students disagreed with the contents of the pamphlets and that Spring is the time of the year student discipline problems reach a crescendo. Dr. Culp was similarly unpersuasive in adducing evidence from which this Court could find that danger of a disruption was very probable:
 "Q. Dr. Culp did you think that these handouts tended to disrupt the school program and interfere with the education of people who were concerned about acquiring an education?
 "A. Yes, I had very definite fears that we might have serious consequences on the campus.
 * * * * *
 "Q. Now let me ask you were there any disturbances or were there any threatened as far as your knowledge is concerned?
 "A. I wouldn't claim anything that happened as a disturbance really, nor would I classify it as a threat. Now I would have to say this, in talking to a number of students, there were suggestions of possible difficulty of great magnitude. I couldn't truthfully say it was a threat as such."
 
 
 [2]
 Admittedly, there is some evidence that these documents were inflammatory on their face, calculated to arouse the resentment of some teachers and students, and — perhaps — even false. To the extent that such speech or conduct is unprotected activity it will be considered later in this dissent. Presently, I am concerned with the majority's holding that there existed a clear and present danger of disruption on campus which could be nipped in the bud under theSchenck standard.
 
 
 [3]
 While the majority opinion characterizes reference to "chastity belts" and "crapping on their heads" as obscene, clearly the purported obscenity of the documents is not a ground of the majority opinion. In any event, those references when read in the context of the "pamphlets as a whole" are not obscene. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L. Ed.2d 1498 (1957)
 
 
 [4]
 Campus officials must have the authority to handle day-to-day disciplinary problems and prevent any material interference with the normal activities of the institution. For example, students could be prohibited from speaking without permission in classrooms because such "free speech" would materially interfere with the rights of other students to learn and with the normal activity of teaching. Furthermore, such a proscription would not be aimed at prohibiting any particular expression, but rather would apply generally to speech in a classroom. Similarly plagerism or falsification of a scholarship application could well be proscribed because such "free expression" materially interferes with the educational standards of the institution, and prejudices the rights of other students in their educacational opportunities. Such a regulation, also, does not run into the danger of prohibiting any particular opinion
 
 
 [5]
 See Part I, supra.
 
 
 [6]
 It is quite true that theTinker record does not include allegations of false and inflammatory language. But the discussion of this Part fully considers all the alleged effects — actual and probable — of such statements; hence the conclusion that Tinker and the instant case are evidentiary analogues with regard to actual or probable effects of material interference — is correct. To the extent the majority opinion rests upon a finding that false and inflammatory language — in the absence of evidence of actual or probable material interference — is unlawful, see Part III, infra.
 
 
 [7]
 A second line of cases — New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, and its progeny — inferentially challenge the constitutionality of concluding that the mere publishing of false and inflammatory statements creates a presumption that such language is, in fact, disruptive and may be proscribed. TheNew York Times rule holds that in matters of public interest, a state cannot authorize recovery for defamatory statements directed at a public official except when such statements are shown to have been made with "actual malice" — that is, either with knowledge of their falsity or with reckless disregard for their truth. See, Pickering v. Board of Education, supra, 391 U.S. at 573, 88 S.Ct. 1731, 20 L.Ed.2d 811. I have not discussed this line of cases because I do not believe that the majority opinion relies on a violation of the New York Times rule, rather it is relying on an "inherent authority" to punish statements which are false and inflammatory and calculated to arouse others without any showing of actual malice, knowledge of the falsity of the statements or reckless disregard of the truth on the part of the students.
 If the majority opinion is relying on the New York Times rule to any extent, there is a total lack of evidence in the record to support the United States Supreme Court definition of "actual malice" stated above. Certainly, evidence that the students' pamphlets were "calculated to arouse resentment" on the part of both teachers and students is not sufficient evidence to support a finding of actual malice. As the United States Supreme Court quoted from Cantwell v. Connecticut, 310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213, 128 A.L.R. 1352 (1940):
 "To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."
 
 
 [8]
 See n. 4, supra.
 
 
 [9]
 Among the stronger statements made by Pickering, "that's [prior approval of letters written to public newspapers] the kind of totalitarianism teachers live in at the high school, andyour children go to school in." (Emphasis added) 391 U.S. at 576-577, 88 S.Ct. at 1739.