Eileen **LOPEZ** et al., Plaintiffs,

v.

Herbert M. **WILLIAMS** et al.,
Defendants.

**Civ. A. No. 71-67.**

United States District Court,
S. D. Ohio, E. D.

Sept. 12, 1973.

Probable Jurisdiction Noted Feb. 19, 1974.

See 94 S.Ct. 1405.

This is an action for injunctive and declaratory relief arising out of the suspension of the nine plaintiffs from Columbus Public School System in February and March, 1971.

A Three-Judge Court was convened under the provisions of Title 28, United States Code, Section 2281. Calloway v. Briggs, 443 F.2d 296 (6th Cir. 1971).

The Court has jurisdiction under the provisions of Title 28, United States Code, §§ 1343(3), 2201 and 2202. Plaintiffs' claims for relief are alleged under the provisions of Title 42, United States Code, Section 1983.

Plaintiffs challenge the constitutionality of § 3313.66 of the Ohio Revised Code and § 1010.04 of the Administrative Guide of the Columbus Public Schools, and the Columbus Public School Policy Statement on Discipline. They allege two claims for relief. First, suspension without the minimal due process safeguards of notice and prior hearing is violative of the Fourteenth Amendment to the Constitution of the United States because it denies students an education, an important public right, without due process of law. Second, the statute and regulation are unconstitutionally vague and overbroad because they provide no ascertainable standard for acceptable conduct.

Upon the consent of all parties and the other members of the panel, the factual issues in this case were tried before the Honorable Joseph P. Kinneary, Chief Judge, United States District Court for the Southern District of Ohio. See Rosado v. Wyman, 397 U.S. 397, 403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) who made the following findings of fact which are adopted fully by the Three-Judge District Court.

Peter D. Roos, Eric E. Van Loon, Cambridge, Mass., of counsel, Denis J. Murphy, Kenneth C. Curtin, Columbus, Ohio, for plaintiffs.

James Hughes, City Atty., Thomas A. Bustin, Asst. City Atty., Columbus, Ohio, for defendants.

Before PECK, Circuit Judge, KINNEARY, Chief District Judge and RUBIN, District Judge.

## OPINION

KINNEARY, Chief District Judge.

This matter is before the Court on plaintiffs' motion for judgment on the pleadings under the provisions of Rule 12(c) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

The plaintiffs presented evidence relating to the dismissals from school of Dwight Lopez, Betty Jane Crome, Susan Cooper, and Deborah Fox. In addition, Phillip Fulton, principal of Marion-Franklin High School during the 1970–

1971 school year testified by deposition concerning the suspensions from Marion-Franklin High School of plaintiffs Tyrone Washington, Clarence Byars, Rudolph Sutton and Bruce Harris. There was no evidence presented to the Court concerning the suspension from the Columbus Public School System of the plaintiff Carl Smith.

Plaintiffs seek to maintain a class action. Phillip Fulton, principal of Marion-Franklin High School in February–April, 1971, testified on deposition that on or about March 15, 1971 fourteen students were recommended for suspension from his school. Dwight Lopez, a student at Central High School testified that he personally knew more than 75 students who were suspended from Central High School on February 26, 1971. Doctor John Ellis, Superintendent of Columbus Public Schools, testified on deposition that the Department of Pupil Personnel keeps some records on suspensions, but he did not have them available at the time of his deposition. No other evidence relating to the number of students suspended in February–April, 1971 was received by the Court.

Section 3313.66, Ohio Revised Code provides, in relevant part, that:

. . . the principal of a public school may suspend a pupil from school for not more than ten days. . . . Such . . . principal shall within twenty-four hours after the time of expulsion or suspension, notify the parent or guardian of the child, and the clerk of the board of education in writing of such expulsion or suspension including the reasons therefor. The pupil or the parent, or guardian, or custodian of a pupil so expelled may appeal such action to the board of education at any meeting of the board and shall be permitted to be heard against the expulsion. At the request of the pupil, or his parent, guardian, custodian, or attorney, the board may hold the hearing in executive session but may act upon the expulsion only at a public meeting. The board may, by a majority vote of its full membership, reinstate such pupil. No pupil shall be suspended or expelled from any school beyond the current semester.

Section 1010.04 of the Administrative Guide to the Columbus Public Schools (January 2, 1973) provides that:

Pupils may be suspended or expelled from school in accordance with the provisions of § 3313.66 of the Revised Code.

The parties introduced into evidence three memorandums from the Department of Pupil Personnel of the Columbus Public Schools on the subject of suspension of students from school. The earliest memorandum is dated August 16, 1971.[1] None of the memorandums

---

[1]. The memorandums are dated August 16, 1971; February 21, 1973; and July 10, 1973. The memorandum of August 16, 1971 provides, in relevant part, with regard to suspension that when a principal suspends a student he should:

"1. Notify him of the exact reason and the term of the suspension.

2. Notify the parent, by phone if possible, and explain the suspension.

3. Within 24 hours, write the parent a letter including the reason of the suspension.

4. Send a carbon copy of this letter to Pupil Personnel. On cases where you expect difficulty, or on cases which are not retained, be sure to include a brief summary of the incident along with any other information which may be of help.

5. Be ready and available for a conference if one is requested by the parent.

The length and term of a suspension are left at the discretion of the principal. Be sure the students and parents know the exact date when the suspension ends."

The memorandum of February 21, 1973 provides, in relevant part, with regard to suspension that when a principal suspends a student he should:

"1. Notify him [the student] of the exact reason and term of the suspension.

2. Notify the parent, by phone if possible, and explain the suspension.

3. Within 24 hours, write the parent a letter including the reason for the suspension and the date the student is to return to school.

were in effect at the time plaintiffs were suspended from the Columbus Public Schools.

Phillip Fulton, principal of Marion-Franklin High School during the 1970–1971 academic year, testified that the following procedure was in effect at the time of the suspensions which are the basis of the present action:

> Basically, the assistant principals are the disciplinarians. They held the discipline responsibility in a given school. The majority of times, the incident does not occur with an administrator. It occurs in a situation where a teacher refers it to administration.
>
> . . .
>
> The teacher would send to the office in written form, it was to be written. We had a form that we followed indicating the incident, what had happened, and this was brought to the office at the time the student was brought to the office. The administrator then would go over the incident as written or as dictated by the teacher with the student. The student then would be given an opportunity, if the student didn't agree with the way it happened, then he would send back for the teacher and bring the teacher in who if we have some reason to see if there is a discrepancy. We then asked the teacher to interpret what he has written for us. If there is a large discrepancy where a student would deny it and the teacher would confirm it, then we would react upon this information according to what the teacher tells us. Then if it is deemed that there is a suspension, you follow the procedure that I have already formulated. You call the parent first and then send the student home. Again, if we can't find the parent, we keep the student until his normal

school day is over. So they are retained until their school day is completed. The parent, if he can be contacted in the meantime, then would be informed of the situation. This would be followed then by a letter stating again that we would discuss but including also the time of the appointment, if it has been prearranged. If not, the parent may get in tomorrow. They might say that they can get in tonight and maybe have time to see the administrator and that would be set up at that time. . . .

> . . . . . .
>
> [At the conference] [t]he problem, the individual, we talk about their school record. We get their entire school record. We talk about their academic problems, if they exist. We talk about their potential. We talk about their goals. It is a conference to remedy the problem and you try to find a solution so that the student is successful in his schooling. . . .
>
> [It is not a conference to verify the facts supporting the suspension.] It is to communicate with the parent, as part of my responsibility, the problem that exists and ask for their help. We inform them and then find out what directions we can take that will eliminate the need for further problems.

On July 10, 1973, the Department of Pupil Personnel of the Columbus Public Schools forwarded to all principals a memorandum containing guidelines for the suspension of students. The memorandum contained the following guidelines:

> A. *Grounds for suspension.*
> 1. Violation of any City of Columbus Ordinance or state or federal law; and

---

4. Send a carbon copy of this letter to pupil personnel. On cases where you expect difficulty, or on cases which are not routine, be sure to include a brief summary of the incident along with any other information which may be of help.

The length and term of a suspension are left at the discretion of the principal. Be sure the students and parents know the exact date when the suspension ends."

2. Violation of written school rules of Board of Education regulations; and

3. Activities which interfere with or threaten the orderly functioning of school activities including classrooms, extra-curricular and athletic activities; and

4. Any activity which is grounds for expulsion. This shall include, but not be limited to, assault on a teacher, arson, or destruction of school property, active leadership in school disruption and direct refusal to follow a direct order from an administrator in time of school tension.

B. *Suspension procedures.*

1. Whenever an incident occurs which may lead to a suspension, the principal or assistant principal shall investigate the nature of the alleged offense before commencing suspension procedures. Unless the pupil is unavailable or unwilling to discuss the incident with the principal, this investigation shall include a discussion with the pupil so that the pupil may be given an opportunity to be heard with respect to the alleged offense.

2. If the principal determines that grounds for suspension do exist, he shall notify the pupil of the exact reason and length of the suspension and further inform the pupil that the suspension means he must stay off school property and away from school-sponsored activities during the entire term of the suspension.

3. Notify the parent or guardian of the suspension, by phone if possible, and explain the reason and length of the suspension. Except in cases of disruption where circumstances make it vital that one or several pupils be removed from the school property immediately because of a threat to the safety of other pupils, faculty or school property, no pupil shall be released from school during the school day without notifying the parent or guardian in person or by phone.

4. The parent or guardian shall be provided an opportunity to attend a conference with the principal, to review the reasons for the suspension.

5. Within 24 hours after the incident leading to the suspension, a letter shall be written to the parents or guardian which shall include the reasons for and term of the suspension and that a conference with the principal will be arranged, at mutual convenience, at the earliest possible time. A carbon copy of this letter, together with relevant information regarding the suspension, shall be sent to Pupil Personnel (designated agent of Clerk of Board of Education).

6. In the event that any suspension is subsequently found to be erroneous, all references to the suspension shall be expunged from the school records.

7. At the conclusion of a suspension, it is the responsibility of the principal to see that the pupil is informed that the suspension is terminated and he is eligible to return to school.

## DWIGHT LOPEZ

In February, 1971, Dwight Lopez was 19 years of age and a student at Central High School, Columbus, Ohio. He was the only witness to give testimony regarding his suspension from Central High School. Defendants did not present any evidence regarding Dwight Lopez's suspension from Central High School, other than the letters sent by the Administration at Central High School to Dwight Lopez's parents regarding the suspension.

Dwight Lopez testified that in late February, 1971, there was tension at Central High School over Black History Week. On the morning of February 26, 1971, he had a free study period in the lunch room. While he was in the lunch

room, black students came in and started overturning tables. Dwight Lopez testified that he and several of his friends walked out of the lunch room. He testified that he took no part in the unlawful activity, and that he did not violate any school rule or any other rule.

On the morning of February 26, 1971, school was suspended at Central High School. Dwight Lopez returned to his home. There he received a phone call from Mr. Calvin Parks, Principal of Central High School, notifying him that he had been suspended. He was not advised of the reasons for the suspension.

Dwight Lopez's parents received the following letter dated February 26, 1971:

Dear Mr. and Mrs. Lopez:

We have had a continued [sic] problem in school for several days and today a group of students disrupted our complete school program.

Dwight was in the group and we need to have a personal conference with you and Dwight to determine what the problem may be. Please keep him at home until a conference can be arranged. This will take some time. We will be communicating with you.

Respectfully,

Calvin Parks, Principal

On March 1, 1971, Mr. and Mrs. Lopez received the following letter:

Dear Mr. and Mrs. Lopez:

It will be necessary for you to appear at the Board of Education before Dwight returns to school. I have given your telephone number to Mr. Williams of the Pupil Personnel Office of the Board of Education. He will be in touch with you to set up an appointment.

Dwight is to remain home during the hours school is in session.

Yours truly,

James C. Furgason

On March 5, 1971, Mr. and Mrs. Lopez were advised that a meeting had been set for March 8, 1971. Dwight Lopez testified that on March 8, 1971, he, his mother and a sister went to the Board of Education building but could not get in because the entrance was blocked by several hundred persons who were present at a rally protesting Board of Education policies. No further meeting was scheduled.

Dwight Lopez testified that his sister wrote a letter to Columbus Public School officials protesting his suspension.[2] He further testified that following March 8, 1971, his mother and his sister called the Office of Pupil Personnel but could not get past the secretary. On March 24, 1971, Dwight Lopez was transferred from Central High School to the Adult Day School. He did not request this transfer. Dwight Lopez testified that he did not attend the Adult Day School

2. Defendants offered into evidence Dwight Lopez's Columbus Public School's cumulative record folder. It contained the following letter, dated March 24, 1971 to Mrs. Eileen Lopez from Mr. H. M. Williams, Director of Pupil Personnel from Columbus Public Schools:
Dear Mrs. Lopez:
I have received a letter from your daughter, Mrs. Alana Robinson, pertaining to your son, Dwight. She was inquiring as to the status of Dwight and his returning to school in Columbus.
As you no doubt recall, I had scheduled an appointment with you and Dwight on March 8, 1971 at 8:30 a. m. The purpose of this conference was to discuss various possibilities relating to Dwight's future educational plans.
This appointment was not kept nor did I receive from you a request to set up another conference. Since Dwight is 19 years of age and is no longer of compulsory school age, I thought that possibly you had made other plans for Dwight.
In regards to Dwight's placement in a Columbus school, permission is granted for him to enroll in Adult Day School, 272 S. Nelson Road, immediately. Waiver of fees is being recommended.
Sincerely,
H. M. Williams, Director
Pupil Personnel

during the Spring of 1971. However, he returned to the Columbus Adult Night School and received his diploma on June 10, 1972.

## BETTY CROME

In March, 1971, Betty Crome was 13 years of age and a student at McGuffey Junior High School. She was the only witness to give testimony regarding her suspension from McGuffey Junior High School. The defendants presented no testimony regarding her suspension, other than a letter from the principal of McGuffey Junior High School to Miss Crome's parents. Betty testified that on March 3, 1971, she went to her first period class. When class was dismissed, there were disturbances in the hall. Students were breaking light bulbs and throwing glasses in the school cafeteria. She could not get to her second period class, therefore she went out into the playground with other students. The principal came out into the playground and told the students assembled there to go home.

Betty further testified that she went with other students to Linden McKinley High School which was on her way home, and it was her purpose to return to her home. However, she stopped with the other McGuffey Junior High School students at Linden McKinley High School. There she was arrested by Columbus police officers and taken to the Juvenile Bureau of the Columbus Police Department. Police called her mother who came to get her. Prior to releasing her they discussed Betty's situation with her mother. No charges were brought by the police department.

On or about March 3, 1971, Betty's mother received the following letter:

Dear Mrs. Adams:

This is official notification that your son/daughter, Betty J. Crome, has been temporarily suspended from McGuffey Junior High. This suspension will continue until March 8, 1971 at 10:45 at which time you are to accompany him/her to school for a con-ference. During this time he/she is to remain at home during school period.

Yours respectfully,

Frank D. Mason, Principal

Betty further testified that neither she nor her parents were ever advised of the reasons for her suspension. Her mother never talked with the principal regarding the suspension. She was returned to McGuffey Junior High School on or about March 8, 1971. She was not given an opportunity to make up work that she missed during the period of her suspension. She is currently a student in the Columbus Public School system.

## DEBORAH FOX

In March, 1971, Deborah Fox was 16 years of age and a tenth grade student at Marion-Franklin Senior High School. She testified that on March 10, 1971, there were disturbances at Marion-Franklin High School. During the noon hour, Mr. Kollmer, an assistant principal, came up to her in the cafeteria and told her that he wanted her to come to his office. Mr. Kollmer said that if she didn't go to his office, she could go home for 10 days. Miss Fox went to Mr. Kollmer's office after talking with her mother on the telephone. Mr. Kollmer then told her that she was suspended for 10 days. She testified that she did not do anything which violated any rule or regulation of the school.

Miss Fox further testified that she was not given an opportunity to explain her side of the story. There was no hearing in which the facts underlying her suspension was determined.

On March 19, 1971, she went with her father to Mr. Kollmer's office and she was advised that she was again suspended for a period of 10 days. She stated no reason was given for the suspension.

Miss Fox further testified that following this second 10 day suspension, she was transferred from Marion-Franklin to South High School and completed the school year there. Her family then moved into the district of East High

School and she was permitted to attend school there. Subsequently, she graduated from Central Night School in June, 1972.

Betty further testified that she was not given an opportunity to make up any of the work that she missed during her suspension. She believed that her grades went down following her suspension and transfer.

Phillip Fulton, principal of Marion-Franklin High School, gave testimony by deposition which is in conflict with the testimony given by Deborah Fox. This principal testified that on Wednesday, March 10, 1971, at approximately 9:00 a. m., students were assigned either to a "club activity" or to a study hall. Four girls, including Deborah Fox, left their club "and had gone into the halls and created a disturbance". They refused to obey a teacher's order to return to their club activity. Two assistant principals were unable to get the four girls to abide by school rules. Mr. Fulton then arrived, and told the girls to report to their assigned class. Mr. Fulton did not suspend any of the students. They apparently complied with his order to return to class.

Mr. Fulton testified that during the confrontation in the hallway Miss Fox was "very loud and disrespectful." She shouted at Mr. Kollmer, an assistant principal, "I hate you." During the noon hour Mr. Kollmer confronted Miss Fox in the school cafeteria. She was "still making negative comments." Mr. Fulton testified that she again told Mr. Kollmer "I hate you." Mr. Kollmer told her to report to the administration office. Miss Fox refused. Mr. Kollmer then contacted her mother and requested that she come to the school to pick her up. Mr. Kollmer talked with plaintiff's mother prior to imposing the suspension. Mr. Fulton acquired his information regarding Miss Fox's conduct in part as a result of reports made to him by Mr. Kollmer. He also personally observed and heard Miss Fox's disruptive activity in the administration offices. Mr. Fulton testified that she was mak-

ing rude and derogatory remarks to both of his assistant principals, Mr. Kollmer and Mr. Gill.

On March 10, 1971, Mr. Kollmer wrote the following letter to Miss Fox's parents:

Dear Parents:

I have suspended Deborah from Marion-Franklin High School until Friday, March 19.

Deborah was extremely defiant and disrespectful with the assistant principal today.

During the suspension period, your daughter is to remain at home during school hours, and not attend Marion-Franklin athletic events or other school sponsored activities during the day or evening. If there are any questions, please phone me at school.

Sincerely,

Richard Kollmer,

Assistant Principal

Mr. Fulton testified that on March 19, 1971, Miss Fox "returned to school with her parents again and repeated the same kind of behavior that she had repeated earlier, again being disrespectful of Mr. Kollmer . . . and disrespectful in the office." On March 19, 1971, Mr. Kollmer sent the following letter to Miss Fox's parents:

Dear Parents:

I have suspended Deborah Fox from Marion-Franklin High School until Monday, March 29, or until contacted by Mr. Robert Carter or his representative regarding your daughter's school placement.

During the suspension period, your daughter is to remain at home during school hours, and not attend Marion-Franklin athletic events or other school sponsored activities during the day or evening. If there are any questions, please phone me at school.

Sincerely,

Richard Kollmer,

Assistant Principal

Mr. Fulton testified that he and his staff exhausted all avenues open to them with regard to Miss Fox's school behavior. He testified that she was a bright student but did not apply herself because she had a peer group position of leadership which identified her in the role of militant. Mr. Fulton believed that the transfer and consequent change of environment would result in better academic achievement for Miss Fox. Miss Fox's cumulative record folder contains the following entry under a category denominated "Additional Test Results —Comments": "3–15–71 Suspended for student disruption".

## SUSAN COOPER

Susan Cooper testified that in March, 1971 she was an eleventh grade student at Marion-Franklin High School. On Monday, March 15, 1971, there was racial tension at Marion-Franklin High School. She wanted to go home, but was unwilling to leave without an excuse. She went to the school attendance office in an attempt to be excused. She talked with Mr. Richard Kollmer, assistant principal, who told her that she had to go to class. She told Mr. Kollmer that her mother had told her to go home if there were continuing tensions in the school. Mr. Kollmer told her "Well, you are suspended anyway."

Susan further testified that she met her mother on her way home. She and her mother returned to the school. They waited to talk with Mr. Kollmer but he was unavailable. Mr. Gill, another assistant principal, told them to go home for 10 days, and that when she came back they could have a conference. She was not given an opportunity to tell her side of the story.

Mr. Gill sent Mrs. Cooper the following letter dated March 16, 1971:

Dear Mrs. Cooper:

I have suspended Susan, your daughter, from Marion-Franklin High School until Thursday, March 25. I will reserve 11:00 a. m. on this day for a conference with you and your daughter.

Susan was involved in the disturbance at school on Monday, March 15, at which time she showed a lack of respect for the principal.

During the suspension period, your daughter is to remain at home during school hours, and not attend Marion-Franklin athletic events or other school sponsored activities during the day or evening. If there are any questions, please phone me at school.

Sincerely,

Oscar R. Gill,

Assistant Principal

Susan further testified that following the 10 day suspension, she returned to Marion-Franklin High School with her mother, at which time they had a conference with the principal or an assistant principal. The facts leading up to the suspension were not discussed in any detail.

Susan Cooper was not permitted to make up any work she missed during the 10 day suspension. During the 1971–1972 school year Susan was elected homecoming queen of Marion-Franklin High School. She graduated in June, 1972.

Mr. Fulton, the principal at Marion-Franklin High School, testified that on March 15, 1971, he ordered Miss Cooper to go to class, but that she refused. Mr. Fulton further testified that she was insolent and encouraged other students not to obey his order to go to class.

## OTHER STUDENTS

The named plaintiffs, Tyrone Washington, Clarence Byars, Rudolph Sutton, Bruce Harris and Carl Smith did not testify at the hearing before the single-Judge District Court. No evidence was offered in their behalf.

Mr. Fulton, the principal of Marion-Franklin High School gave deposition testimony regarding the suspensions of Tyrone Washington, Clarence Byars, Rudolph Sutton, and Bruce Harris.

Mr. Fulton testified that on Monday, March 15, 1971, at approximately 9:00 a. m., there were disturbances in the eight to ten homerooms which were held in the school auditorium. When the disrupting students were notified that if they did not return to their homerooms, they would be suspended, they voluntarily went to their homerooms.

When the class bell rang for the first morning period, a group of black students entered the auditorium and refused to leave. The auditorium was scheduled to be used as a classroom during the first period. The group of students three times refused to obey an order to leave. One of the students, Tyrone Washington, told Principal Fulton that they (the students) were tired of listening to him and that now it was his turn to listen to them. Tyrone Washington further told Principal Fulton that they (the students) were going to tell him what was to be done. The principal suspended Tyrone Washington for disrupting the educational program. Washington was removed from the auditorium by two plainclothed policemen.

Oscar Gill, an assistant principal at Marion-Franklin High School, sent a letter dated March 16, 1971 to the parents of Tyrone Washington:

Dear Parents:

I have suspended Tyrone, your son, from Marion-Franklin High School until Thursday, March 25. The Pupil Personnel Department of the Columbus Board of Education will notify you concerning a disposition of this case.

Tyrone was involved in a disturbance at school on Monday, March 15. He defiantly refused to follow the directions of the principal. Furthermore, he created an explosive situation.

During his suspension, your son is to remain at home during school hours, and not attend Marion-Franklin athletic events or other school sponsored activities during the day or evening.

If there are any questions, please phone me at school.

Sincerely,

Oscar R. Gill,

Assistant Principal

School records indicate that Tyrone Washington was graduated from Marion-Franklin High School on June 6, 1971. The school records contain the following information under the heading "Additional Test Results—Comments": "3-15-71 Suspended for school disruption".

Mr. Fulton further testified that while Tyrone Washington was being removed from the auditorium Rudolph Sutton attacked a police officer. Sutton was then suspended from school. On March 16, 1971, Mr. Gill, an assistant principal, had a conference with Rudolph Sutton, his parents and his sister. Another conference was held on March 25, 1971 with Rudolph Sutton and his family.

On March 23, 1971, Rudolph Sutton was transferred from Marion-Franklin High School to South High School. He was graduated from South High School on June 6, 1971. Under the heading "Additional Test Results—Comments" the following entry appears on his school records: "3-18-71 Suspended for school disruption".

Mr. Fulton testified that Clarence Byars was in the halls of Marion-Franklin High School on March 15, 1971 and refused an order to go to class. Further, Mr. Fulton testified that Clarence Byars encouraged other students to refuse to go to class. Mr. Fulton then called Clarence Byars' mother and conferred with her on the telephone. Clarence Byars was suspended from school on March 15, 1971.

Richard Kollmer, assistant principal at Marion-Franklin High School, wrote the following letter to Clarence Byars' parents dated March 15, 1971:

Dear Parents:

I have suspended Clarence from Marion-Franklin High School until

Thursday, March 18. I will reserve 9:00 a. m. on this day for a conference with you and your son.

Clarence refused to go to class as directed, was disrespectful with the principal, and was inciting a school disruption.

During the suspension period, your son is to remain at home during school hours, and not attend Marion-Franklin athletic events or other school sponsored activities during the day or evening. If there are any questions, please phone me at school.

Sincerely,

Richard Kollmer,

Assistant Principal

Columbus Public School records indicate that Clarence Byars was graduated from Marion-Franklin High School on June 11, 1972. Clarence Byars' school file also contains a copy of the March 15, 1971 letter from Assistant Principal Richard Kollmer, notifying his parents of his suspension from high school.

Mr. Fulton testified that on March 23, 1971, during the course of an assembly in the Marion-Franklin High School auditorium Bruce Harris and several other black students stood up, turned their backs to the assembly speaker, and gave the "Black Pledge". Bruce Harris was suspended for disrupting the assembly program.

Mr. Fulton testified that he attempted to contact Bruce Harris' brother, who acted as his guardian, but was unable to do so. Bruce Harris did not return to school on March 30, 1971 when his suspension was terminated. The following letter was sent by Assistant Principal Oscar R. Gill dated March 23, 1971 to Bruce Harris' brother:

Dear Mr. and Mrs. Robinson:

I have suspended Bruce, your brother, from Marion-Franklin High School until Tuesday, March 30.

During the suspension the Pupil Personnel Department of the Columbus Board of Education will review with you the contents of the letter of November 6, 1970.

Bruce disrupted the assembly and walked out of the assembly during this morning. This he did after the principal made clear that if a student did, he would be suspended.

During the suspension period, your brother is to remain at home during school hours, and not attend Marion-Franklin athletic events or other school sponsored activities during the day or evening. If there are any questions, please phone me at home.

Sincerely,

Oscar R. Gill,

Assistant Principal

Records of the Columbus Public School system indicate that Bruce Harris graduated from the evening high school on June 14, 1972. There is no indication in his official school records that he was suspended from Marion-Franklin High School.

There was no testimony regarding Carl Smith's suspension from the Columbus Public Schools. Carl Smith's Columbus Public School's file indicates that he was graduated from Columbus Evening High School on June 14, 1972. There is no indication in the school records submitted to the Court that plaintiff was suspended from high school in March of 1971. There is an indication that he was withdrawn from Central High School on March 31, 1971 because he was over-age.

In addition to the above facts found by the single-Judge United States District Court and adopted by the Three-Judge United States District Court, the parties entered into a stipulation of fact filed with the Court on October 10, 1972. A copy of the stipulation of fact is attached as an appendix to the Court's finding of facts.[3]

3. On May 25, 1973, counsel for defendants filed a motion to withdraw the stipulation on the ground that the defendants were then informed that a hearing was going to be held on the

Norval Goss, present Director of Pupil Personnel of the Columbus Public Schools, compiled a chart of the named plaintiffs' cumulative academic record. He drew the conclusion that plaintiffs' suspensions had no effect on their academic achievement as reflected in their grade point averages.[4]

factual issues and that plaintiffs should be put to the burden of proving the allegations contained in their complaint. The Court notes that the facts contained in the stipulation were all proven by the testimony and exhibits offered at the hearing before the single-Judge District Court. Basically, the stipulation itself was skeletal in nature. The facts conceded by defendants were those contained in letters from school administrators to suspended students and their parents and notations in students' official Columbus Public School records. There is no indication in the memorandum in support of the motion to strike the stipulation that any matters contained in the stipulation were untrue. Thus, the facts in the stipulation would be subject to a request for admissions under Rule 36(a), Fed.R.Civ.

P. Additionally, the Court notes that defendants in their answer admitted almost every fact contained in the stipulation. All of paragraphs 5, 7, 8, 9, 10 and 13 of the stipulation are admitted. Paragraph 1 is admitted, except for the seventh sentence thereof. Paragraph 2 was admitted, except for Betty J. Crome's age. Paragraph 3 was admitted, except for the third and fifth sentences. Paragraphs 4, 6, 11, 12, 14 and 15 of the stipulation are not admitted by the answer. Upon consideration, and being fully advised, the Court HOLDS that the motion is without merit, and therefore it is DENIED.

Defendant's Exhibit B is attached to the findings of fact and made a part of this Opinion and Order as if fully written herein.

## APPENDIX

| 4 | 1967–68 | | 1968–69 | | 1969–70 | | 1970–71 | | 1971–72 | | 1972–73 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Credits earned | Point average | Credits earned | Point average | Credits earned | Point average | Credits earned | Point average | Credits earned | Point average | Credits earned | Point average | Final point average |
| Byars, Clarence | | | 5.9 | 2.70 | 5.7 | 2.67 | 5.1 | 2.63 | 4.0 | 2.00 | | | 2.559 |
| Cooper, Susan | | | 4.7 | 1.98 | 5.7 | 1.91 | 5.1 | 1.80 | 2.5 | 2.20 | | | 1.933 |
| Crome, Betty | | | | | | | (2.8) | .79 | (2.2) | .71 | 4.2 | 1.00 | |
| Fox, Deborah | | | | | 4.7 | 2.04 | 5.7 | 1.91 | 5.0 | 1.36 | 1.5 | 3.66 | 2.087 |
| Harris, Bruce | 4.2 | 1.33 | 3.2 | .76 | 2.6 | .63 | 2.5 | 1.17 | 4.0 | 1.89 | | | 1.074 |
| Lopez, Dwight | 4.2 | 1.33 | .2 | .04 | 5.6 | .85 | 3.0 | 1.66 | 4.0 | 2.11 | | | 1.037 |
| Smith, Carl | 4.7 | 1.19 | 1.0 | .19 | 4.2 | 1.09 | 2.7 | 1.90 | 4.4 | 1.77 | | | 1.258 |
| Sutton, Rudolph | 4.2 | 1.57 | 5.9 | 1.68 | 4.6 | 2.28 | 4.0 | 1.75 | | | | | 1.818 |
| Washington, Tyrone | 4.8 | 2.00 | 3.7 | 1.40 | 4.2 | 2.00 | 5.5 | 2.09 | | | | | 1.861 |

DEFENDANT'S EXHIBIT B

Mr. Goss testified that students receive zeros for work missed during a suspension. They are not accorded the opportunity to make up the work. Mr. Goss conceded that any absence from school may have negative educational effects.

Plaintiffs presented evidence that suspension from school results in psychological harm to the student. The effects of suspension are not uniform. Most suspended students respond in one or more of the following ways:

1. The suspension is a blow to the student's self-esteem.

2. The student feels powerless and helpless.

3. The student views school authorities and teachers with resentment, suspicion and fear.

4. The student learns withdrawal as a mode of problem solving.

5. The student has little perception of the reasons for the suspension. He does not know what offending acts he committed.

6. The student is stigmatized by his teachers and school administrators as a deviant. They expect the student to be a troublemaker in the future.

A student's suspension may also result in his family and neighbors branding him a troublemaker. Ultimately repeated suspension may result in academic failure.

## CONCLUSIONS OF LAW

The Three-Judge Court adopts in full the factual findings of the single-Judge District Court. The factual issues having been resolved, the case is now before the Three-Judge Court for decision of the legal questions presented. Before reaching the constitutional questions presented, several procedural and jurisdictional issues must be considered.

## CLASS ACTION

▉ Plaintiffs seek to maintain this action "on behalf of all other students residing in the City of Columbus who are similarly situated and affected by the policy and usage complained of" in the complaint.

The prerequisites of a class action are that:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a), Fed.R.Civ.P.

When the class is limited to all students of the Columbus Public Schools suspended on or after February, 1971, the class alleged satisfies each of these prerequisites. The Court determines that the class action is maintainable under the provisions of Rule 23(b)(2) in that the Columbus Public Schools and their employees have acted in accordance with § 3313.66, Ohio Revised Code and guidelines established by the Department of Pupil Personnel in all suspensions.

## JURISDICTION OVER THE SUBJECT MATTER

Title 42, United States Code, Section 1983 provides, in relevant part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The complaint alleges that § 3313.66, Ohio Revised Code, which provides that a "principal of a public school may suspend a pupil from school for not more than ten days" with a provision for notice to the student's parents and the clerk of the Board of Education, is unconstitutional.

Defendants argue that § 3313.66, Ohio Revised Code is not the source of a principal's authority to suspend a student. Rather, defendants assert in their brief that "a school board and the local school officials possess historical inherent power" to discipline students.[5] Section 3313.66, Ohio Revised Code, defendants argue, is not a source of authority, but a limitation on school authorities' inherent power to discipline students. Defendants contend that because they were acting pursuant to their inherent authority and not under color of state law pursuant to Section 3313.66, the complaint fails to establish that the Court has jurisdiction over the subject matter.[6]

■ Article 6, § 3 of the Ohio Constitution commands that:

Provision shall be made by law for the organization, administration and control of the public school system of the state supported by public funds. . . .

The Ohio Legislature has established school districts, Chapter 3311, Ohio Revised Code, which provide free public elementary and secondary education for every Ohio resident between the ages of six and 21 years.[7] Although imprecise usage has led to the misconception that the power to discipline is "inherent", see

48 O.Jur.2d Schools, § 176, the power to discipline students is actually mandated by Section 3313.20, Ohio Revised Code, which provides in relevant part:

The board of education shall make such rules and regulations as are necessary for its government and the government of its employees, pupils of its schools, and all other persons entering upon its school grounds or premises. . . .

It is well-recognized in Ohio that boards of education are purely creatures of statute whose powers and duties are limited by the Legislature. Verberg v. Board of Education, 135 Ohio St. 246, 248, 20 N.E.2d 368 (1939); Perkins v. Bright, 109 Ohio St. 14, 21, 141 N.E. 689 (1923); State ex rel. Clarke v. Cook, 103 Ohio St. 465, 467, 134 N.E. 655 (1921).

■ When defendants acted to suspend plaintiffs they were acting under the color of Article 6, § 3 of the Ohio Constitution, legislation implementing Article 6, § 3, and the rules and regulations adopted by the school board and its delegates pursuant to §§ 3313.20 and 3313.66, Ohio Revised Code. There is no merit to defendants' contention that they were not acting under color of state

---

5. Defendants cite Rumler v. Board of School Trustees, 327 F.Supp. 729, 737 (D.S.C.1971), affirmed, 437 F.2d 953 (4th Cir. 1971), and the cases cited therein, in support of the inherent power of school officials to discipline students. See also, Tate v. Board of Education, 453 F.2d 975, 978–979 (8th Cir. 1972); Norton v. Discipline Committee of East Tennessee State University, 419 F.2d 195, 200 (6th Cir. 1969), cert. denied, 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562 (1970); Esteban v. Central Missouri State College, 415 F. 2d 1077, 1088 (8th Cir. 1969), cert. denied, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970); Banks v. Board of Public Instruction, 314 F.Supp. 285, 290 (S.D.Fla.1970), affirmed, 450 F.2d 1103 (5th Cir. 1970), vacated to permit timely filing of notice of appeal, 401 U.S. 988, 91 S.Ct. 1223, 28 L.Ed.2d 526 (1971); Jones v. State Board of Education, 279 F.Supp. 190, 202 (M.D.Tenn.1968), affirmed, 407 F.2d 834 (6th Cir. 1969), cert. dismissed as improvidently granted, 397 U.S.

31, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970), rehearing denied, 397 U.S. 1018, 90 S.Ct. 1230, 25 L.Ed.2d 432 (1970). *But see*, Soglin v. Kauffman, 418 F.2d 163, 167 (7th Cir. 1969). The Court in *Rumler* rejected plaintiffs' argument that they were denied due process of law when they were suspended without the protection of due procedural safeguards. However, the Court did not suggest that it was without subject matter jurisdiction to entertain the claim for relief under 42 U.S.C. § 1983. Indeed, the Court denied the claim on the merits.

6. In their motion to dismiss defendants argue on similar grounds that the complaint fails to allege facts stating a cause of action. There has been a trial of the factual issues before a single-Judge, therefore the three-Judge Court will determine the issues on the merits, not by motion to dismiss.

7. § 3313.64, Ohio Revised Code.

law within the meaning of 42 U.S.C. § 1983.

## JURISDICTION OVER THE PERSON

Defendant Board of Education argues that the Court does not have jurisdiction over it, because it is not a "person" within the meaning of 42 U.S.C. § 1983.[8]

Under Ohio law a board of education is a "body politic and corporate" which is "capable of suing and being sued". Section 3313.17, Ohio Revised Code. Even though it is not immune from suit,[9] an Ohio board of education is a political subdivision of the State. *See,* Brown v. Board of Education, 20 Ohio St.2d 68, 71–72, 253 N.E.2d 767 (1969).

In Monroe v. Pape, 365 U.S. 167, 187–192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court held that a city was not amenable to a suit for damages under the provisions of 42 U.S.C. § 1983 because the legislative history of the Civil Rights Act of 1871 demonstrated a Congressional intent that political subdivisions of a State not be included within the definition of a "person" under the Act.

Subsequent to the decision many federal courts recognized a distinction between suits for damages, which were barred by Monroe v. Pape, and suits for declaratory and injunctive relief, which were considered actionable. *See e. g.,* Dailey v. City of Lawton, 425 F.2d 1037 (10th Cir. 1970); Schnell v. City of Chicago, 407 F.2d 1084 (7th Cir. 1968); Atkins v. City of Charlotte, 296 F.Supp. 1068 (W.D.N.C.1969); *Cf.* Monroe v. Pape, 365 U.S. *supra* at 191, n. 50, 81 S.Ct. 473.[10] Applying this rationale some courts have held that a school board is a "person" within the meaning of 42 U.S.C. § 1983 when the complaint seeks equitable relief only, and not damages. Butts v. Dallas Independent School District, 436 F.2d 728, 729 (5th Cir. 1971); Harkless v. Sweeny Independent School District, 427 F.2d 319 (5th Cir. 1970), cert. denied, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971); Williams v. San Francisco Unified School District, 340 F.Supp. 438, 438–439 (N.D.Cal.1972); Schreiber v. Joint School District No. 1, 335 F.Supp. 745, 747 (E.D.Wis.1972); Callaway v. Kirkland, 334 F.Supp. 1034, 1036–1037 (N.D.Ga.1971); Henson v. City of St. Francis School District, 322 F.Supp. 1034 (E.D.Wis.1971); Local 858 of A. F. of T. v. School District No. 1, 314 F.Supp. 1069 (D.Colo.1970); Abel v. Gousha, 313 F.Supp. 1030 (E.D. Wis.1970); Porcelli v. Titus, 302 F. Supp. 726 (D.N.J.1969); Adams v. School Board, 53 F.R.D. 267 (M.D.Pa. 1971). *See,* Lee v. Board of Regents, 441 F.2d 1257 (7th Cir. 1971). A number of other courts have held that a school board is not a "person" under the provisions of 42 U.S.C. § 1983 regardless of the nature of the relief sought. Kerr

8. Section 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

9. Whether a board of education is a sovereign arm of the State cloaked with immunity which the State has waived or an entity which is not entitled to immunity because it is not sovereign is an unresolved question in Ohio. *Cf.* Board of Education v. Volk, 72 Ohio St. 469, 74 N.E. 646 (1905) with State v. Gibson, 130 Ohio St. 318, 322, 199 N.E. 185 (1935).

10. Since the decision in Monroe v. Pape the United States Supreme Court has decided many cases in which equitable relief was sought under 42 U.S.C. § 1983 against a state, city, or school board, without discussion of whether they are "persons" under the Act. *See, e. g.,* Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed. 2d 506 (1964); Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Tinker v. Des Moines, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

v. Clarenceville School District, 344 F. Supp. 1244, 1246 (E.D.Mich.1972); Webb v. Lake Mills Community School District, 344 F.Supp. 791, 807 (N. D.Iowa 1972); Hayes v. Cape Henlopen School District, 341 F.Supp. 823 (D.Del.1972); Guelich v. Mounds View Independent Public School District, 334 F.Supp. 1276, 1279 (D.Minn. 1972); Conway v. Alfred I. DuPont School District, 333 F.Supp. 1217, 1218 (D.Del.1971); Blount v. Ladue School District, 321 F.Supp. 1245, 1250 (E.D. Mo.1970); Morey v. Independent School District, 312 F.Supp. 1257 (D.Minn. 1969), affirmed, 429 F.2d 428 (8th Cir. 1970); Patton v. Bennett, 304 F.Supp. 297, 299 (E.D.Tenn.1969). Although the Sixth Circuit has not ruled on the exact question, it has taken the general position that political subdivisions of a state are not "persons" within the meaning of 42 U.S.C. § 1983 regardless of the nature of the relief sought. *See,* Deane Hill Country Club, Inc. v. City of Knoxville, 379 F.2d 321, 323–324 (6th Cir. 1967).

■ Two recent United States Supreme Court decisions leave little doubt as to the proper resolution of the issue presented. In Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L. Ed.2d 596 (1973), the Supreme Court held that a county was not a "person" within the meaning of 42 U.S.C. § 1983 because it was not Congress' intention "to impose liability on political subdivisions of the States." In City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), the Supreme Court held that Congress did not intend a distinction between actions for money damages and those for injunctive and declaratory relief in defining the word "person" in 42 U.S.C. § 1983. Thus, if a governmental entity is a political subdivision of a State, it is not a "person" within the meaning of 42 U.S. C. § 1983 regardless of whether the suit is for legal or equitable relief.

■ The Columbus Board of Education is a political subdivision of the State of Ohio, and is, therefore, not a "person" within the meaning of 42 U.S. C. § 1983. The Court HOLDS that the motion to dismiss the defendant, Columbus Board of Education, is meritorious, and therefore granted.

■ Defendants further argue that if the Court does not have jurisdiction over the Columbus Board of Education, it cannot rule on the constitutionality of Section 3313.66, Ohio Revised Code and the regulation adopted pursuant to that section.

The United States Supreme Court in Ex parte Young, 209 U.S. 123, 159–160, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908) stated the theory of liability under § 1983:

If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

The named defendants acted under authority of State law as employees of the Columbus Board of Education. If the State law or their actions under color of that law deprived plaintiffs of their constitutional rights, the deprivation is actionable under § 1983.

Defendants argue that only the Columbus Board of Education has the authority to abandon the present disciplinary procedures, and therefore the Court has no jurisdiction to declare the constitutionality of the statute and regulations and to enjoin their enforcement.

■ The Columbus School Board has no authority to license its employees to violate the United States Constitution. If an employee of the Columbus Board of Education acts, under the authority of state law and regulations adopted

pursuant thereto, in such a manner as to deprive someone of his constitutional rights, this Court has the power to declare the statute and regulations a nullity and to enjoin the employee from acting under the unconstitutional statute to deprive anyone of his constitutional rights. *Ex parte Young, supra.*

## MOOTNESS

Defendants argue that the suspension guidelines adopted by the Department of Pupil Personnel on July 10, 1973 moot the constitutional question presented.

■ The new guidelines have no impact upon the constitutional claims of the named plaintiffs or of any member of the class they represent who was suspended prior to July 10, 1973.[11] If their suspensions were imposed without due process of law, they have a right to a declaration that the suspension procedure was unconstitutional and to the expunction of any reference to the suspension from all records maintained by the Columbus Public Schools. There is a present, live controversy, and not a moot action. *See,* Golden v. Zwickler, 394 U. S. 103, 110, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

## EXHAUSTION OF STATE COURT REMEDIES—ABSTENTION

Defendants contend that plaintiffs should have contested their suspensions and the constitutionality of § 3313.66, Ohio Revised Code in the State courts of Ohio.[12]

■ There is no requirement under 42 U.S.C. § 1983 that State court[13] remedies be exhausted prior to seeking federal relief. Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 1829, 36 L.Ed.2d 439 (1973); Houghton v.

Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); King v. Smith, 392 U.S. 309, 312 n. 4, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L. Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 671, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

Defendants also argue that the Court should abstain from determining the constitutionality of § 3313.66, Ohio Revised Code, to permit the Ohio court to have the first opportunity to construe its terms. See, Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L. Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S. Ct. 777, 27 L.Ed.2d 792 (1971).

■ The Civil Rights Act of 1871 was intended by Congress to provide a federal remedy for the deprivation of constitutional rights which was supplementary to state remedies. Monroe v. Pape, 365 U.S. at 183, 81 S.Ct. 473, *supra.* The federal remedy is not dependent upon a State remedy.

■ In the present case plaintiffs have no remaining administrative remedies. Their remedy, if any, is State court review of the administrative action resulting in their suspensions. Under such circumstances a federal court should not abstain from considering the constitutionality of a state statute. *See,*

---

11. Plaintiffs have not engaged in conduct which would subject them to the newly adopted suspension procedures. Thus, they cannot sue on their own behalf or on the behalf of others for relief from the newly adopted suspension procedures. *See,* Hall v. Beals, 396 U.S. 45, 48–49, 90 S.Ct. 200, 24 L.Ed.2d 214 (1963).

12. Defendants suggest the suspensions were reviewable under the provisions of § 2506.01, Ohio Revised Code.

13. More accurately, the doctrine of exhaustion applies to administrative, not judicial, remedies. Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 1695, 36 L.Ed.2d 488 (1973) n. 13.

Gibson v. Berryhill, 411 U.S. 564, 93 S. Ct. 1689, 1697, 36 L.Ed.2d 488 (1973).

## PROCEDURAL DUE PROCESS

The Fourteenth Amendment to the Constitution of the United States provides that no State shall:

> deprive any person of life, liberty, or property, without due process of law.
> . . .

The right to procedural due process applies to a broad spectrum of important private and governmentally created interests. *See, e. g.,* Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) (Education. Proof of residence for entitlement to in-state fee rates); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1973) (Parole. Revocation of parole without hearing); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (Child custody. Father denied custody without fitness hearing); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L. Ed.2d 90 (1971) (Driver's license. Uninsured motorist's driver's license suspended without hearing unless security posted following accident); Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (Reputation. Public posting of notice person not to be sold liquor); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (Welfare benefits. Welfare benefits terminated without prior notice and hearing); Sneadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L. Ed.2d 349 (1969) (Wages. Wages garnisheed without notice or opportunity to defend); Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637, 100 L. Ed. 692 (1956) (Public employment. Teacher discharged without notice and hearing.)

 When presented with an allegation that due process has been denied, the Court must first determine whether the interest left unprotected falls within the ambit of a liberty or property within the meaning of the Fourteenth Amendment. This is an inquiry into the *nature* of the interest at stake, not its *weight*. If it is a protected interest, the Court then looks at the weight of the interest and the extent of its deprivation to determine what process is due. Board of Regents v. Roth, 408 U.S. 564, 570–571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

> The concept of liberty includes
>
> not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Those interests included within the concept of liberty are not limitless, but the United States Supreme Court has recognized that

> In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. Board of Regents v. Roth, 408 U.S. at 572, 92 S.Ct. at 2707, *supra*. [citations omitted]

The Supreme Court has not resolved the question of whether a student's statutory right [14] to an education is a liberty which is protected by due process of law. The Supreme Court has frequently referred to the importance of education in the American system of government.

---

14. In Ohio primary and secondary education is given free to all school district residents between the ages of six and 21 years. Section 3313.64, Ohio Revised Code. School attendance is compulsory between the ages of six and 18 years. Section 3321.01, Ohio Revised Code.

In Brown v. Board of Education the Court noted that:

> education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

See, San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 29, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Wisconsin v. Yoder, 406 U.S. 205, 213, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Abington School District v. Schempp, 374 U.S. 203, 230, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Williams v. Dade County School Board, 441 F.2d 299, 302 (5th Cir. 1971); Sullivan v. Houston Independent School District, 333 F. Supp. 1149, 1172 (S.D.Tex.1971); Ordway v. Hargraves, 323 F.Supp. 1155, 1158 (D.Mass.1971); Hosier v. Evans, 302 F.Supp. 316, 319 (D.St. Croix 1970).

Recently in San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) the Supreme Court was presented with the question of whether differential State aid to local school districts violates the equal protection clause of the Fourteenth Amendment. The Court, in determining whether the rational basis test, United States v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); Gomez v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L. Ed.2d 56 (1973); United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973); Jefferson v. Hackney, 406 U.S. 535, 546, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1971); Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 172–173, 92 S. Ct. 1400, 31 L.Ed.2d 768 (1972); Richardson v. Belcher, 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Morey v. Doud, 354 U.S. 457, 465–466, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957); Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Gulf, Colorado & Sante Fe Ry v. Ellis, 165 U.S. 150, 17 S.Ct. 255, 41 L.Ed. 666 (1896); Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), or the compelling state interest test, Dunn v. Blumstein, 405 U.S. 330, 342–343, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Shapiro v. Thompson, 394 U.S. 618, 634, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), should be applied to the legislative scheme, stated that the right to an education was not explicitly or implicitly guaranteed by the Constitution. Consequently, the Court applied the rational basis test, not the compelling state interest test. San Antonio School District v. Rodriguez, 411 U.S. at 29, 93 S.Ct. 1278, supra.

The Supreme Court's holding that the right to an education is not explicitly or implicitly guaranteed by the Constitution does not affect the determination of whether it is a liberty or property which cannot be interfered with by the State without the protection of due procedural safeguards. As noted above, interests included within the concepts of liberty

and property are often rights created by the State which have no Constitutional status.[15]

[■] The question presented is whether the State created right to an education is a protected liberty under the Fourteenth Amendment's due process clause.[16]

Since the decision in Dixon v. Alabama State Board of Education, 294 F. 2d 150 (5th Cir. 1961) the lower federal courts have without exception recognized that a student has the due process right to notice and hearing prior to expulsion or suspension from school for a substantial period of time. Woods v. Wright, 334 F.2d 369 (5th Cir. 1964); Esteban v. Central Missouri State College, 415 F.2d at 1089, *supra*; Norton v. Discipline Committee of East Tennessee State University, 419 F.2d 195, 200 (6th Cir. 1969), cert. denied, 399 U.S. 906, 90 S. Ct. 2191, 26 L.Ed.2d 562 (1970); Williams v. Dade County School Board, 441 F.2d 299, 301–302 (5th Cir. 1971); Esteban v. Central Missouri State College, 277 F.Supp. 649, 651–652 (W.D.Mo. 1967); Jones v. State Board of Education of Tennessee, 279 F.Supp. 190, 198 (M.D.Tenn.1968), affirmed, 407 F.2d 834 (6th Cir. 1969) cert. dismissed as improvidently granted, 397 U.S. 31, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970), rehearing denied, 397 U.S. 1018, 90 S.Ct. 1230, 25 L.Ed.2d 432 (1970); Stricklin v. Regents of the University of Wisconsin, 297 F.Supp. 416 (W.D.Wisc.1969); Sullivan v. Houston Independent School District, 307 F.Supp. 1328, 1337 (S.D. Tex.1969); Hobson v. Bailey, 309 F. Supp. 1393 at 1401–1402; Sullivan v. Houston Independent School District, 333 F.Supp. 1149 (S.D.Tex.1971); De-Jesus v. Penderthy, 344 F.Supp. 70, 74–75 (D.Conn.1972). Although suspension from school for a short period of time as opposed to a lengthy suspension or ex-

pulsion is a lesser interference with the right to education, the due process clause of the Fourteenth Amendment still cloaks the student. Tate v. Board of Education of Jonesboro Arkansas, 453 F.2d at 979, *supra*; Farrell v. Joel, 437 F.2d 160, 162 (2d Cir. 1971); Esteban v. Central Missouri State College, 415 F.2d at 1089, *supra*; Madera v. Board of Education of the City of New York, 386 F.2d 778, 784–785 (2d Cir. 1967). No Court faced with the question has held that the right to an education is not within the concept of "liberty".

It is important to remember that even though the interference with the liberty of a right to education is limited, the student's right treated with procedural fairness prior to a deprivation of the right to an education is not lost. The magnitude of the deprivation affects the formality and comprehensiveness of the due process safeguards; it does not affect the basic fact that these safeguards shield the student from arbitrary or capricious interference with his right to education. In Board of Regents v. Roth, 408 U.S. 564, 570–571 fn. 7 and 8, 92 S. Ct. 2701, 2705, 33 L.Ed.2d 548 Justice Stewart discussed the applicability of procedural due process to protected Fourteenth Amendment liberties:

Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." Boddie v. Connecticut, 401 U.S. 371, 379 [, 91 S.Ct. 780, 786, 28 L. Ed.2d 113]. "While '[m]any controversies have raged about . . . the Due Process Clause,' . . . it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate [a protected]

---

15. See, p. 1297, *supra*.

16. The right to an education is not an interest traditionally considered to be within the concept of "property", even though an education undoubtedly has an economic as well as an intangible value. However, governmental entitlements in our modern society often take on the incidents of property. *See generally,* Reich, The New Property, 73 Yale L.J. 733 (1964).

interest . . ., it must afford 'notice and opportunity for hearing appropriate to the nature of the case' *before* the termination becomes effective." Bell v. Burson, 402 U.S. 535, 542 [, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90]. For the rare and extraordinary situations in which we have held that deprivation of a protected interest need not be preceded by opportunity for some kind of hearing, see, *e. g.*, Central Union Trust Co. v. Garvan, 254 U.S. 554, 566 [, 41 S.Ct. 214, 215, 65 L.Ed. 403]; Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 597 [, 51 S.Ct. 608, 611, 75 L.Ed. 1289]; Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594 [, 70 S.Ct. 870, 94 L.Ed. 1088].

"The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." Boddie v. Connecticut, *supra*, [401 U.S.,] at 378, [91 S.Ct., at 786]. See, e. g., Goldberg v. Kelly, 397 U.S. 254, 263 [, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287]; Hannah v. Larche, 363 U.S. 420 [, 80 S.Ct. 1502, 4 L.Ed.2d 1307]. The constitutional requirement of opportunity for *some* form of hearing before deprivation of a protected interest, of course, does not depend upon such a narrow balancing process.

If education is a protected liberty when expulsion is involved, then it remains a liberty when suspension occurs. The right to an education is the interest being afforded procedural protection. It either is, or is not a liberty under the Fourteenth Amendment. The difference between expulsion and suspension becomes important only when the Court confronts the question of what process is due to protect the Fourteenth Amendment liberty.

Considering the importance of education in our society today, the Court HOLDS that the State created entitlement to an education is a liberty protected by the due process clause of the Fourteenth Amendment.

The Court now turns to the more difficult question of what process is due a student before the State may deprive him of his right to an education by imposing a suspension not to exceed 10 days.

The primacy of the educator in the school has been unquestioned by the Courts. The Courts have consistently reaffirmed the right of school administrators to manage their school systems without interference from the Courts, so long as the basic commands of the Constitution are honored.

The Courts have repeatedly emphasized the need for affirming the comprehensive authority of the states and of school officials consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. Tinker v. Des Moines School District, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed. 2d 731 (1969). *See also*, Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); Bright v. Nunn, 448 F.2d 245 (6th Cir. 1971); Robinson v. Board of Regents, 475 F.2d 707 (6th Cir. 1973); Tate v. Board of Education of Jonesboro, Blackwell v. Issaquena City Board of Education, 363 F.2d 749, 753 (5th Cir. 1966); Jackson v. Dorrier, 424 F.2d 213, 218–219 (6th Cir. 1970), cert. denied, 400 U.S. 850, 91 S.Ct. 55, 27 L.Ed.2d 88 (1970); Norton v. Discipline Committee of East Tennessee State University, 419 F.2d 195 (6th Cir. 1969); Banks v. Board of Public Instruction of Dade County, 314 F.Supp. 285, 289 (S.D.Fla.1970), affirmed, 450 F.2d 1103 (5th Cir. 1971) vacated to permit timely filing of appeal, 401 U.S. 988, 91 S.Ct. 1223, 28 L.Ed.2d 526 (1971).

The Courts have vigorously asserted the right, and indeed the duty of school administrators to prohibit student behavior which materially disrupts classwork, endangers property or interferes with the rights of other students. Tinker v. Des Moines School District, 393 U. S. at 513, 89 S.Ct. 733, *supra*; Soglin v. Kauffman, 418 F.2d 163, 167 (7th Cir. 1969); Esteban v. Central Missouri

State College, 415 F.2d 1077, 1087 (8th Cir. 1969); Gardenhire v. Chalmers, 326 F.Supp. 1200, 1202, *supra* (D.Kan. 1971); Hobson v. Bailey, 309 F.Supp. 1393, 1400 (W.D.Tenn.1970); General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Learning, 45 F.R.D. 133, 141 (W.D.Mo. *en banc* 1968). Remembering that school officials are better suited to make decisions affecting their institutions, the Court nonetheless is Constitutionally bound to insure that the student be afforded the minimum procedural process mandated by the Constitution.

▆ The nature of the due process protection of the right of education is dependent on the severity of the sanction. Tate v. Board of Education of Jonesboro Arkansas, 453 F.2d at 979, *supra;* Farrell v. Joel, 437 F.2d at 162, *supra*; Jackson v. Hepinstall, 328 F.Supp. 1104, 1106 (N.D.N.Y.1971); Rumler v. Board of School Trustees for Lexington County, 327 F.Supp. 729, 744 (D.S.C. 1971), affirmed, 437 F.2d 953 (4th Cir. 1971); Gardenhire v. Chalmers, 326 F. Supp., at 1203, *supra*. When the sanction is a short suspension as opposed to a lengthy suspension or expulsion, more informal procedures may be adopted by school authorities who make the disciplinary determination. Tate v. Board of Education of Jonesboro Arkansas, 453 F.2d at 979, *supra*; Farrell v. Joel, 437 F.2d at 163, *supra*; DeJesus v. Penberthy, 344 F.Supp. at 74, *supra*; Jackson v. Hepinstall, 328 F.Supp. at 1106, *supra*; Rumler v. Board of School Trustees for Lexington County, 327 F.Supp. at 744, *supra*; Schwartz v. Schuker, 298 F.Supp. 238 (E.D.N.Y.1969).

All courts which have considered the problem have recognized the authority of school administrators to suspend students for a short period without a hearing if an emergency situation requires the removal of the disruptive student from the school to restore an academic atmosphere. Williams v. Dade County School Board, 441 F.2d at 301, *supra*; Sullivan v. Houston Independent School District, 333 F.Supp. at 1172, *supra*; Gardenhire v. Chalmers, 326 F.Supp. at 1205, *supra*; Banks v. Board of Public Instruction of Dade County, 314 F.Supp. at 291–292, *supra*; Hobson v. Bailey, 309 F.Supp. at 1400, *supra*; Buck v. Carter, 308 F.Supp. 1246, 1249–1250 (W.D.Wisc.1970); Stricklin v. Regents of the University of Wisconsin, 297 F. Supp. at 420, *supra*.

▆ Due process is not a straitjacket imposed by the Courts upon educators. The minimum requirements of notice and a hearing prior to suspension, except in emergency situations, does not require inflexible procedures. Courts must be mindful not to require educators to follow specific or particular procedural frameworks. Due process is satisfied if the procedures are "reasonably calculated to be fair to the student and lead to a reliable determination of the factual issues involved." Gardenhire v. Chalmers, 326 F.Supp. at 1202–1203, *supra*. As the District Court stated in DeJesus v. Penberthy, 344 F. Supp. at 74, *supra*:

> School authorities must be given discretion within wide limits to find facts and assess their significance. Their knowledge of the context within which discipline problems arise entitles their judgment to be accorded great weight. On the other hand, there is less reason to accord school authorities as much discretion in fashioning procedures. However flexible the contours of due process may be in . . . the ascertainment of the outer limits is a judicial function under the Fourteenth Amendment. Of course, school authorities must have some discretion in developing fair procedures. Hopefully, they will not assume that the minimum requirements of the Due Process Clause as determined by the courts are all that they as school administrators, should determine to accord students as a matter of sound educational policy.

The Fourteenth Amendment due process requirement of notice in a hearing are "nothing more than fair play." Banks v. Board of Public Instruction of Dade

County, 314 F.Supp at 291, *supra*. If school administrators follow procedures which result in a fair factual determination made after notice and an opportunity to defend against the charges of misconduct, then no matter how informal the procedure, the student has been accorded the minimum requirements of the due process clause of the Fourteenth Amendment of the Constitution of the United States.

■■■■ The decisions which have dealt with the subject in the composite provide that at a minimum procedural fairness requires:

1. Immediate removal of a student whose conduct disrupts the academic atmosphere of the school, endangers fellow students, teachers or school officials, or damages property.

2. Immediate written notice to the student and parents of the reason(s) for the removal from school and the proposed suspension should be given within 24 hours.

3. Not later than 72 hours after the actual removal of the student from school, the student and his parents must be given an opportunity to be present at a hearing before a school administrator who will determine if a suspension should be imposed.

Such hearing, which is not a judicial proceeding, must provide at a minimum

(a) Statements in support of the charge(s) against the student upon which the hearing is conducted.

(b) Statements by the student and others in defense of the charge(s) and/or in mitigations or explanation of his conduct.

(c) The administrator is not required to permit the presence of counsel or follow any prescribed judicial rules in conducting the hearing.

(d) The administrator should, within 24 hours advise the student and his parents by letter of his decision and the reasons therefor.

■■■■ School administrators are free to adopt regulations providing for fair suspension procedures which are consonant with the educational goals of their schools and reflective of the characteristics of their school and locality. There is no one way to insure fairness in the suspension process. The choice of the best procedure for a particular school system should be left to the school officials charged with the administration of that school system.

In the present case plaintiffs were not accorded a hearing. The conference required by school regulations following suspension was not a fact-finding hearing, but rehabilitative in nature. None of the named plaintiffs were in fact afforded even this conference. There is no evidence in the record that any of the plaintiffs voluntarily relinquished their right to a hearing.

■■■■ The Court holds that plaintiffs were not accorded due process of law, in that they were suspended without hearing prior to suspension or within a reasonable time thereafter.[17]

■■■■ The Court orders that references to the suspensions of plaintiffs or members of their class be removed from all records of the Columbus Public Schools.

## VAGUENESS AND OVERBREADTH

Plaintiffs contend that the disciplinary regulations under which they were suspended are void because they are unconstitutionally vague and overbroad. *See, e. g.,* Baggett v. Bullit, 377 U.S. 360, 367–378, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Chaplinsky v. New Hamp-

---

17. This holding does not reflect upon the wisdom or propriety of the suspensions themselves. Phillip Fulton's testimony fully supports the suspensions he imposed. However, the Court does not review the appropriateness of the suspension. The limited issue is whether the procedure employed met the minimum standards of due process. The Court holds that it did not.

shire, 315 U.S. 568, 573, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939); Grayned v. City of Rockford, 408 U.S. 104, 114–115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Zwickler v. Koota, 389 U.S. 241, 249–250, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

 The concepts of vagueness and overbreadth are safeguards against governmental intrusion upon First Amendment rights. *See*, Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 168, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1973). Plaintiffs have failed to prove that their conduct at the time of their suspensions was entitled to First Amendment protection. On the contrary, the evidence establishes that the various school administrators acted to restore order and discipline in their schools. In such circumstances, the actions of school administrators do not contravene the First Amendment. *See*, Norton v. Discipline Committee of East Tennessee State University, 419 F.2d at 200, *supra*; Esteban v. Central Missouri State College, 415 F.2d at 1088, *supra*; Banks v. Board of Public Instruction, 314 F.Supp at 290, *supra*; Jones v. State Board of Education, 279 F.Supp. at 202, *supra*.